**BUCKEYE COMMUNITY HOPE FOUNDATION, et al.,**
Plaintiffs,

v.

**CITY OF CUYAHOGA FALLS,**
et al., Defendants.

No. 5:96 CV 1458.

United States District Court,
N.D. Ohio,
Eastern Division.

June 20, 1997.

Diane E. Citrino, Housing Advocates, Inc., Cleveland, OH, Edward G. Kramer, Kramer & Nierman, Cleveland, OH, for Buckeye Community Hope Foundation, Cuyahoga Housing Partners, Inc., Buckeye Community Three L.P., Fair Housing Contact Service.

Virgil E. Arrington, Jr., City of Cuyahoga Falls, Department of Law, Cuyahoga Falls, OH, for City of Cuyahoga Falls, Gregg Wagner, Gerald M. Dzurilla.

Virgil E. Arrington, Jr., City of Cuyahoga Falls, Department of Law, Cuyahoga Falls, OH, Jack Morrison, Jr., E. Marie Wheeler, Steven W. Mastrantonio, Amer, Cunningham, Brennan, Akron, OH, for Don Robart.

William E. Schultz, Office of the Prosecuting Attorney, Akron, OH, for Summit County Bd. of Elections.

Roger Gupta, Munroe Falls, OH, pro se.

### ORDER

SAM H. BELL, District Judge.

The above-captioned matter came before this Court on the filing of a Complaint by Plaintiffs Buckeye Community Hope Foundation ("Buckeye"), Cuyahoga Housing Partners, Inc., Buckeye Community Three L.P., and the Fair Housing Contact Service, in which they requested injunctive relief from what they alleged to be violations of rights guaranteed by the Constitution's Due Process and Equal Protection Clauses, as well as violation of those rights protected by federal fair housing laws. On November 19–21, 1996, the Court conducted a hearing and took evidence regarding Plaintiffs' request for a preliminary injunction. Ultimately, the Court approved an injunction stipulated to by the parties which enjoined the Defendant Summit County Board of Elections from certifying the results of a referendum concerning the Plaintiffs' ability to build low-income housing on land in Cuyahoga Falls. (Docket # 68.) However, because the Court found there to be no showing of irreparable harm to Plaintiffs, their request for an injunction ordering the Defendant City of Cuyahoga Falls to issue building permits was denied. (Docket # 78.) In the Order denying Plaintiffs' preliminary injunction request, the Court deferred consideration of the merits of the underlying causes of action, concluding that such consideration would be more appropriately addressed after evaluating the Defendants' motions for summary judgment. The Court then referred those motions to Magistrate Judge James D. Thomas for a report and recommendation.

Presently before the Court is the report of the Magistrate, in which he recommends that this Court grant the motions for summary judgment filed by Defendants the City of Cuyahoga Falls, Mayor Don Robart, Clerk of City Council Gregg Wagner, and Chief Engineer Gerald M. Dzurilla. While Defendants largely agree with the Magistrate's analysis or conclusions, Plaintiffs' objections are numerous and weighty. (*See* docket # s 88, 89, 90.) Since the issuance of the Magistrate's Report and Recommendation, this Court requested the parties to address three questions raised by their briefs and objections, (docket # 94), and they readily complied (docket # s 95 & 98). The issues having thus been well-framed, the Court now issues its opinion.

### I. Background.[1]

There are two areas of background relevant to the consideration of the pending motions: (1) the facts leading up to the proposed development, referendum and filing of this action; and (2) the procedural context of this action. The two areas are discussed below. Initially, however, one procedural matter warrants an introduction here.

As mentioned above, this Court conducted a three day hearing on Plaintiffs' motion for preliminary injunction in November of 1996. This was the second hearing on Buckeye Community Hope Foundation's request for injunctive relief; a preliminary injunction

---

1. This Background section is taken, with only minor changes, from the thorough and well-documented corresponding section of the Magistrate's report. (Docket # 86, part II, at 2–15.)

hearing was also held in the state action. Plaintiffs' motion for injunctive relief filed in this Court was denied on December 13, 1996. (Docket # 78.) On the motion of Plaintiffs, the transcript of those proceedings has been accepted for consideration in connection with the pending motions for summary judgment. (*See* Order of January 22, 1997, Docket # 84.) The Magistrate relied on portions of the three volume transcript in his report, and this Court will also consider that evidence insofar as it is relevant to the motions now before the Court.

Plaintiff Buckeye Community Hope Foundation ("Buckeye Community Foundation") is a not-for-profit 501(c)(3) corporation. (Hearing Transcript, November 19, 20, and 21, 1996 ("Tr.") at pp. 11–13.) It has as its purpose the development of affordable housing through the use of low income housing tax credits. (*Id.*) Mr. Boone is the President of the Board of Trustees for Buckeye Community Foundation. (Tr. at p. 11.)

Prior to the development of the complex in question here, Buckeye Community Foundation developed at least four other affordable housing complexes in Ohio. (Tr. at p. 15.) As outlined at the hearing before this bench by Mr. Boone and the Executive Director for Buckeye Community Foundation, Mr. P. Barno, Buckeye Community Foundation acts as a developer for each project. (Tr. at p. 389.) For each project, a separate limited partnership is formed as the investment vehicle to sell the tax credits. In this case, the specific limited partnership is Plaintiff Buckeye Community Three, L.P. ("Buckeye Three Limited"). (Tr. at p. 23.) The limited partnership is the owner of the land and, once it is completed, the development. As the project is developed, Buckeye Community Foundation advances fees and expenses until all the financing, including the tax credits, are finalized.[2] Once the complete financial package is arranged and finalized, Buckeye Community Foundation is reimbursed for its expenses in developing the project. Buckeye Community Foundation also receives a "developer's fee" for its services. In this case, the expected fee is $175,000.00. (Boone Dep. at p. 120; Tr. at p. 381.)

To protect each development and its investors, Buckeye Community Foundation forms a separate corporation to act as the general partner for the limited partnership. (Tr. at pp. 22–23.) In this case, Plaintiff Cuyahoga Partners, Inc. ("Cuyahoga Partners"), a for-profit corporation, was formed to serve as the general partner of Buckeye Three Limited.[3] (Tr. at p. 23.) Mr. Boone is the president of Cuyahoga Partners. (Boone Dep. at pp. 6–7.) Buckeye Community Hope Foundation is a fifty-one percent owner of Cuyahoga Partner, and the, other forty-nine percent is owned by Little Country Community, Inc., another 501(c)(3) corporation. (Tr. at p. 396.) Thus, Buckeye Community Foundation controls Cuyahoga Partners which in turn controls Buckeye Three Limited.[4] (Tr. at pp. 23, 389–390.)

Turning to the events leading to the underlying dispute, Mr. Boone testified that he first contacted the Mayor for the City of Cuyahoga Falls, Don Robart, in the summer of 1995 about the possibility of developing a low income housing complex in Cuyahoga Falls.[5] Mr. Boone testified that Hearing Exhibit 23 represents a letter from Buckeye Community Foundation to Mayor Robart dated June 7, 1995. In the letter, Buckeye Community Foundation expressed an interest in developing the land "under the low income housing tax credit program." (Tr. at pp. 20–21.) Mr. Boone indicated that this letter was sent before the purchase of the

---

**2.** For example, in this case the $10,000 loan commitment paid to the bank by Buckeye Three Limited was advanced by Buckeye Community Hope Foundation. (Tr. at p. 397.)

**3.** The initial limited partners were RLJ Management Company and/or Steven Boone individually. (Tr. at p. 398.) RLJ Management Company is "a management company that manages affordable housing in Ohio and elsewhere." (Boone Dep. at p. 7.) There is an "understanding" that RLJ Management Company would manage the complex if it were built. (Tr. at p. 398.) RLJ Management is owned by Mr. Boone. (*Id.*)

**4.** Because of the commonality among these parties, at times they are referred to collectively as "Plaintiff Developers."

**5.** Don Robart is named as a defendant in this action both in his individual and official capacities.

land for the project. (Tr. at p. 21.) According to Mr. Boone, the Mayor expressed no problems about the proposed development at that time. (*Id.*)

The real property, located on Pleasant Meadow Boulevard, was purchased on June 12, 1995. (Complaint at ¶ 13.)

Mr. Boone testified that he started working with Cuyahoga Falls Planning Director, Louis Sharpe, in late August/September of 1995 on the details of the development. (Tr. at pp. 30–31.) The financing for the project was secured in November of 1995. (Tr. at p. 21.)

In January, 1996, Buckeye Three Limited, filed an application for a "site plan review" for the seventy-two unit apartment complex in the City of Cuyahoga Falls. (Complaint at ¶ 15.)

On February 21, 1996, the "site plan" was submitted for approval at a meeting of the Planning Commission for Cuyahoga Falls. (Complaint at ¶ 17; Tr. at p. 33.) In connection with the Planning Commission's meeting, Planning Director Sharpe prepared a Staff Summary of the site plan. (*See* Hearing Exhibit 11; Tr. 128.) This summary recommended approval of the site plan subject to approximately nine conditions agreed to by Mr. Boone. One of the conditions required the developers to erect a fence on one side of the property before the building permit for the apartment complex could issue.

The site plan, including the conditions, was unanimously approved by the Planning Commission at the February 21, 1996 meeting.[6] (Complaint at ¶ 17; Tr. at p. 35.) The Planning Commission's recommendation then had to be submitted to and approved by City Council. (*Id.*) Mayor Robart did not attend the February 21, 1996, Planning Commission meeting. (Tr. at pp. 72–73.)

On March 4, 1996, the Planning Commission's recommendation on the site plan was

---

6. Hearing Exhibit 11 sets forth the conditions prerequisite to the issuance of the building permit as approved by the Planning Commission and as adopted by City Council. (Tr. at p. 90.)

7. Mr. Boone indicated that while he was not aware of any referendum being considered, he

addressed at a City Council meeting. (Tr. at p. 35.) Mayor Robart attended this meeting. (Tr. at p. 36.) According to Mr. Boone, Mayor Robart "came out against" the project during this meeting and suggested that the issue be tabled. (Tr. at p. 39–40.) The issue was tabled.[7] (Tr. at p. 40.)

Another meeting of City Council was held on March 18, 1996. (Tr. at p. 40.) From a review of the materials filed in connection with the motions, one can conclude that this meeting was long and emotional. The minutes reflect that the meeting lasted from 6:15 p.m. until 8:45 p.m. and that several residents expressed their concerns over the development of the complex. Mayor Robart attended the March 18, 1996 meeting and expressed his views in a lengthy statement. (Hearing Exhibit 24 at pp. 12–14.)

According to Mr. Boone, Mayor Robart recommended rejecting the project at the March 18, 1996 Council meeting. (Tr. at p. 43.) The issue was tabled again. Mr. Boone testified, "I believe they said the reason was because they wanted the law department to provide a legal opinion if there was any possible reason, the way it was put, that they could turn us down legally." (Tr. at p. 43.) Mr. Boone acknowledged that he raised the Fair Housing Act at the March 18, 1996 meeting. (Tr. at p. 60; Boone Dep. at p. 16.)

Another Council meeting occurred on April 1, 1996, and the site plan was approved by vote of six to three, with two abstentions. (Complaint at ¶ 19; Tr. at p. 43.) The City Council's approval was expressed in the form of Ordinance No. 48–1996. Ordinance No. 48–1996 states, in pertinent part:

> That this City Council approves the plan for development of land situated in an R–17 Medium Density Multiple Family zoning district in accordance with such district and zoning regulations as stipulated in the Codified Ordinances of the City of Cuyahoga Falls and as approved by the Plan-

recalled the word being used by the City Law Director at either the March 4 or March 18 City Council meeting. (Tr. at pp. 41–42.) Mr. Boone testified that the word referendum "went right over my head" and he did not understand what a referendum was until April. (*Id.*)

ning Commission as per the plans and stipulations contained in Planning Commission File P–6–96–SP.

(Hearing Exhibit # 8, Section 1.)

Mr. Boone testified that they applied for the building permit about two days after the site plan was approved. (Tr. at p. 44.) Upon direct questioning by the Court, Mr. Boone stated that the application was made on either April 3 or 4. (*Id.*) The complaint alleges that the building permit was sought on or about April 5, 1996. (Complaint at ¶ 29.)

Mr. Boone testified that they received the building permit for the fence in April, 1996. (Tr. at pp. 46–48.) Mr. Boone testified that work on the fence did not begin "because it became pretty obvious that we are in a fight, and I wasn't about to—first of all, we don't have the funds to put up a $70,000 fence. If we know we are going to receive with assurity the building permit to build the rest of the project, I—that's basically the reason." (Tr. at p. 48.) Mr. Boone further stated that he did not proceed with building the fence because "the rumors of a referendum were very prevalent." (Tr. at p. 92.) He testified, "I felt the reasonable thing to do was to delay the construction of the fence until I was assured we were going to get a building permit." (Tr. at p. 92.)

Parallel to the site plan approval process, a referendum effort was proceeding. (*See* Complaint at ¶ 24.)

Mr. Lee Minier is a life long resident of Cuyahoga Falls, Ohio. (Tr. at p. 266.) He was called by Plaintiffs to testify at the preliminary injunction hearing. Mr. Minier testified that Hearing Exhibit 19 is a notice for meeting on Tuesday, April 9, 1996 to discuss "taking the ISSUE OF A 72 UNIT HOUSING DEVELOPMENT ON PLEASANT MEADOW BLVD. to the vote of the people of Cuyahoga Falls in November." (Hearing Exhibit 19) (upper case print in original) (Tr. at p. 278–279.) The organizing group, as identified on Hearing Exhibit 19, was the "Citizens for the Preservation of Voters Rights." (*See* Exhibit 19.)

Mr. Minier attended the April 9, 1996 meeting. The Mayor also attended the meeting. (Tr. at p. 279.) The Mayor spoke at the meeting and stated that he supported the referendum effort. (*Id.*) According to Mr. Minier, no City of Cuyahoga Falls officials were asked to sign the referendum petitions. (*Id.*)

Mr. James Kuzmik, a "tester" for the Fair Housing Advocates Association, also attended the April 9, 1996 meeting. (Tr. at p. 291.) According to Mr. Kuzmik, the director of Fair Housing Advocates Association called him and asked him to attend the meeting.[8] (*Id.*) Mr. Kuzmik testified that the referendum process was discussed at this meeting. Mr. Kuzmik was asked, "were there any statements made by members of the Citizens for the Preservation for Voter [Rights] dealing with children?" Mr. Kuzmik said yes. (Tr. at p. 293.) Mr. Kuzmik said he did not recall any one person leading the meeting. (Tr. at p. 296.) On cross examination, Mr. Kuzmik stated that he did not hear Mayor Robart make any discriminatory remarks about African Americans or children at the April 9, 1996 meeting.[9] (Tr. at p. 300.)

On or about April 29 or 30, 1996, a referendum petition was submitted to the Clerk of Council, Gregg Wagner.[10] (Complaint at ¶ 25; Wagner Affidavit at ¶ 5.) The Board of Elections approved the referendum petition on May 1, 1996. (Complaint at ¶¶ 25 and 26; Wagner Affidavit at ¶ 5.)

On May 1, 1996, the state action was filed to enjoin the referendum process under Ohio law. The case was captioned: *Buckeye Community Hope Foundation, et al. v. City of Cuyahoga Falls, et al.,* Case No. CV96–05–1701 (Summit County) (Murphy, J.). The named plaintiffs were Buckeye Community Foundation, Cuyahoga Partners, and Buck-

---

8. Mr. Kuzmik is not a member of Fair Housing Contact Services. (Tr. at p. 291.) Fair Housing Advocates Association is a distinct entity separate and apart from Plaintiff Fair Housing Contact Service.

9. Mr. Kuzmik's handwritten notes taken during the meeting are at Hearing Exhibit 32. (Tr. at p. 298.)

10. Mr. Wagner is named in this lawsuit as a defendant in his official capacity as the Clerk of Council.

eye Three Limited, three of the four named plaintiffs in this action. (See "Complaint for Temporary Restraining Order Declaratory Judgment Injunctive Relief," Docket # 33, Exhibit C.) The state court complaint named as defendants: (1) City of Cuyahoga Falls; (2) Cuyahoga Falls City Council; (3) Gregg Wagner, Clerk of City Council, City of Cuyahoga Falls; and (4) Summit County Board of Elections. (Docket # 33, Exhibit C.) With the exception of the Cuyahoga Falls City Council, the same defendants have been named in this action.

On May 15, 1996, Judge Murphy conducted a hearing on plaintiffs' request for preliminary injunction. (Docket # 33, Exhibit F.) At the hearing, plaintiffs presented the testimony of three witnesses: (1) Mr. Boone; (2) Joseph James Orel, President of JJO Construction, the contractor for the project; (Docket # 33, Exhibit F, p. 13); and (3) Roy Lowenstein, a representative of Ohio Capital Corporation for Housing. (Docket # 33, Exhibit F, p. 17.) Mr. Boone and Mr. Orel also testified at the hearing in November, 1996.[11] (Tr. at pp. 11–106; pp. 109–121.) The plaintiffs in that action were represented by Edward G. Kramer, who represents Plaintiffs in this action as well. (Docket # 33, Exhibit C.)

On May 31, 1996, Judge Murphy denied the plaintiffs' motion for preliminary or permanent injunction.[12] (Docket # 33, Exhibit B.) The decision and judgment was "on the merits." (Docket # 33, Exhibit F, pp. 48–49; *see also*, Attachment to Docket # 77—Ninth Appellate District's December 11, 1996 opinion at p. 3 ("The parties agreed to consider the hearing as a trial on the merits of the case.")).

On June 20, 1996, Mr. P. Gilbertson Barrio, Buckeye Community Foundation's Executive Director wrote to the City of Cuyahoga Falls and renewed his request for issuance of a building permit. (Hearing Exhibit # 16.) On June 26, 1996, Mr. Gerald M. Dzurilla, the City Engineer for Cuyahoga Falls, sent a letter to Mr. Barno and indicated that he could not issue the building permit in light of the pending referendum.[13] (Complaint at ¶ 31; Hearing Exhibit # 15.)

Plaintiffs filed the present action on July 5, 1996, naming as Plaintiffs the three plaintiffs in the state court action, plus one new plaintiff, the Fair Housing Contact Service. The Defendants in this action are: (1) City of Cuyahoga Falls; (2) Don Robart, in his individual and official capacity as Mayor of the City of Cuyahoga Falls; (3) Gregg Wagner, in his official capacity as Clerk of City Council; (4) Summit County Board of Elections; and (5) Gerald M. Dzurilla, in his official capacity as Chief City Engineer. (Docket # 1.) The new Defendants, i.e., those not named in the prior state suit, are Mayor Robart in his individual and official capacity, and Mr. Dzurilla in his official capacity.

In contrast to the complaint filed in state court, the complaint filed in this Court is based upon federal law. The Plaintiffs allege violations of 42 U.S.C. §§ 3601 *et seq.*, 3604, and 3617, 42 U.S.C. §§ 1981 and 1982 (Docket # 1, ¶ 37); the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983 (¶¶ 39, 44); and the Equal Protection Clause of Fourteenth Amendment and 42 U.S.C. § 1983 (¶ 41). Plaintiffs ask this Court to grant them declaratory judgment, to grant an injunction ordering the Defendant City and its officers and agents to issue building permits to the Plaintiff Developers,

11. Several other witnesses testified at the hearing including Louis Sharpe (Tr. at pp. 121–158), Sandra Montgomery (Tr. at pp. 158–164), Crystal Williams (Tr. at pp. 165–169), Kathy Ronca (Tr. at pp. 169–180), Julia Neal (Tr. at pp. 180–185), Gerald Dzurilla (Tr. at pp. 186–198), Dr. Mark Sailing (Tr. at pp. 201–252), George Potts (Tr. at pp. 253–266), Lee Minier (Tr. at pp. 266–288), James Kuzmik (Tr. at pp. 289–300), Don Robart (Tr. at pp. 301–338), and Peter Gilbertson Barno (Tr. at pp. 359–404.) The testimony of each witness has been read and considered by the undersigned. The relevant testimony is discussed *infra* to the extent necessary.

12. Plaintiffs appealed Judge Murphy's decision and on December 11, 1996, the Ninth Appellate District affirmed the decision of the trial court. On March 26, 1997, the Ohio Supreme Court allowed Plaintiffs' appeal, but as of the time of this order, no opinion has been rendered.

13. Gerald Dzurilla is named in this lawsuit as a defendant in his official capacity as "Chief City Engineer."

to enjoin the Defendants from imposing additional burdens on the planning and construction of the development, and to order Defendants to pay compensatory and punitive damages and costs. (Docket # 1, part VI, ¶¶ 2–7.) Originally, the complaint also sought to enjoin the Defendants from placing the referendum on the ballot, (docket # 1, part VI, ¶ 3), however, the referendum has already been placed on the ballot and voted upon by the electors of Cuyahoga Falls, therefore that prayer for relief is moot and no longer before the Court.[14]

## II. Standard of Review.

The Court of Appeals for the Sixth Circuit has summarized the standard of review governing motions for summary judgment under Federal Rule of Civil Procedure 56 as follows:

> Summary judgment is appropriate where "there is no genuine issue of material fact ... and the moving party is entitled to judgment as a matter of law." ... [The] court must view all facts and inferences drawn therefrom in the light most favorable to the non-moving party.
>
> The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim.
>
> "By its very terms, this standard provides that the existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party. If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted."

*LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993) (citations omitted). With this standard in mind, the Court will address the Defendants' present motion.

## III. Res Judicata.

All Defendants argue that the Plaintiffs' instant causes of action are barred by the doctrine of res judicata. As the Magistrate Judge explained, the doctrine of res judicata or claim preclusion "refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of the determination that it should have advanced in an earlier suit." (Docket # 86, at 17 (quoting *Barnes v. McDowell*, 848 F.2d 725 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989)).) The Supreme Court in *Migra v. Warren City School District*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), applied res judicata to a claim, such as some of those now before this Court, brought pursuant to Section 1983. After having pursued causes of action for breach of contract and wrongful interference with her employment contract in state court, the plaintiff, Ms. Migra, filed a Section 1983 action contending the violation of her fundamental rights as protected by the First Amendment. The Supreme Court had little difficulty determining that Ms. Migra's federal cause of action was precluded by her earlier suit in state court. In short, the Court held that federal courts must give full faith and credit to state court judgments including the preclusive effect of those judgments. *Id.*

Thus, in the instant case, this Court must afford the prior state court judgment the same preclusive effect that an Ohio Court would afford it. *Barnes*, 848 F.2d at 730. Ohio has adopted the modern version of the doctrine of res judicata, stating "that a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava v. Parkman Township*, 73 Ohio St.3d 379, 382, 653 N.E.2d 226 (1995). The *Grava* Court further explained

---

**14.** Indeed, Plaintiffs never seriously advanced that prayer for relief; they did not file their preliminary injunction motion until the week af-

ter the election, November 14, 1996. (Docket # 56.)

that for two suits to be based upon the same transaction, there must be a "common nucleus of operative facts." *Id.* If the suits share a common nucleus of operative facts, then a plaintiff cannot bring the second action *"even though [he] is prepared ... (1) To present evidence or grounds or theories of the case not presented in the first action, or (2) To seek remedies or forms of relief not demanded in the first action."* *Id.* at 383, 653 N.E.2d 226.

Applying that law to the matter now before the Court, there is evidence that both this and the Plaintiffs' original state action derive from at least some of the same operative facts. As the Magistrate noted, fifteen paragraphs of the complaint in the instant case were taken almost verbatim from the complaint in the previous state action. Those paragraphs explain, among other things, the mission of the Plaintiff Foundation, the zoning of the property in question, and the procedure followed by the Plaintiffs and the obstacles encountered by them in their attempt to realize their goal of building the low-income housing project. (*See* Complaint ¶¶ 12, 14–20, 23–27.) Still, as Plaintiffs suggest, notable differences can be found in paragraphs 13, 24, 28, and 29. Normally, it would be for this Court to determine whether the factual differences as alleged in those paragraphs are of such disparate substance that the federal causes of action arise from a different nucleus of operative facts.

The Court finds, however, that Defendants' claim of res judicata turns instead on a distinctly different line of analysis. In *Jamestown Village Condo. Owners Association v. Market Media Research, Inc.,* 96 Ohio App.3d 678, 685, 687, 645 N.E.2d 1265 (1994), the Cuyahoga County Court of Appeals acknowledged and adopted the declaratory judgment exception to the general rule of claim preclusion. In the *Jamestown* Court's words, "a declaratory judgment [brought pursuant to O.R.C. § 2721] is not res judicata on an issue or claim not determined thereby even though it was known and existing at the time of the original action." *Id.* at 685, 645 N.E.2d 1265. *See also, Ketchel v. Bainbridge Township,* 79 Ohio App.3d 174, 177, 607 N.E.2d 22 (Geauga Cy. 1992) ("a declara-

tory action determines only what it actually decides and does not have a claim preclusive effect on other contentions that might have been advanced") (quoting Restatement of Law 2d, Judgments Section 33 (1982)). The rationale for this exception is grounded in the reasons for allowing actions for declaratory judgment, themselves. As explained in the Restatement (Second) of Judgments,

> Historically, an action at law generally could not be maintained unless the defendant had already violated a duty owed to the plaintiff, and the purpose of the action was to redress the wrong already committed. On the other hand, in some circumstances a suit in equity might be maintained to prevent the commission of a threatened wrong and, even though no wrong had been committed or threatened, to secure a determination—which might well be called a declaration—of the rights of the parties.... (Section 33, Comment a.)
>
> \* \* \* \* \* \*
>
> When a plaintiff seeks solely declaratory relief, the weight of authority does not view him as seeking to enforce a claim against the defendant. Instead, he is seen as merely requesting a judicial declaration as to the existence and nature of a relation between himself and the defendant. The effect of such a declaration, under this approach, is not to merge a claim in the judgment or to bar it. Accordingly, regardless of outcome, the plaintiff or defendant may pursue further declaratory or coercive relief in a subsequent action.... A declaratory action is intended to provide a remedy that is simpler and less harsh than coercive relief, if it appears that a declaration might terminate the potential controversy. (Section 33, Comment c.)

In other words, an action for declaratory judgment is intended to be a mechanism by which the parties can potentially avoid full-fledged litigation on a number of claims, by initially focusing on a single case-dispositive issue. It would defeat this purpose if a court were to bar subsequent actions based on different legal theories due to the res judicata effect of an initial declaratory action.

Nonetheless, as the Court has noted above, in 1995 the Ohio Supreme Court adopted the "modern" view of the doctrine of res judicata. *Grava v. Parkman Township*, 73 Ohio St.3d 379, 653 N.E.2d 226 (1995). One might pose the question, therefore, if an exception to the 1994 version of res judicata would survive the implementation of the modern 1995 rule. The Court holds that it does.

First of all, the Court notes that there was very little which was new in the *Grava* Court's holding.[15] Granted, before the opinion in *Grava*, Ohio's seminal case on res judicata, *Norwood v. McDonald*, 142 Ohio St. 299, 52 N.E.2d 67 (1943) (syllabus ¶ 2), stated the now-outdated approach which allowed subsequent suits for different cause of actions, but that old approach has not been followed by the Ohio Supreme Court in recent years. As a matter of fact, the Ohio Supreme Court shifted back to the "modern" view at least by 1986 when it issued *Rogers v. City of Whitehall*, 25 Ohio St.3d 67, 69, 494 N.E.2d 1387 (1986) ("an existing final judgment or decree between the parties to litigation is conclusive as to all claims which were *or might have been litigated* in a first lawsuit."). Indeed, the *Grava* opinion explains as much and cites to both the *Rogers* opinion and its opinion in *National Amusements, Inc. v. Springdale*, 53 Ohio St.3d 60, 62, 558 N.E.2d 1178, 1180 (1990), as examples. The most reasonable explanation for the holding in its syllabus in *Grava* is that the Ohio Supreme Court realized that this modern understanding of the law had not yet been reduced to a syllabus so as to conform with that unique custom of Ohio law. A review of *Grava* and its predecessors reveals that the "modern" approach to res judicata has been taken since the mid–1980s. It follows that the declaratory judgment exception to res judicata applied by the *Jamestown* Court in 1994, was recognized and adopted within the context of the "modern rule."

Another reason for this Court to conclude that Ohio recognizes the declaratory judgment exception is that the "modern rule" which was expressly adopted by the Ohio

Supreme Court in *Grava* was taken from the same Restatement upon which the *Jamestown* Court relied in finding the declaratory judgment exception to res judicata. *See Grava*, syllabus (adopting 1 Restatement of the Law 2d, Judgments (1982), Section 24–25); *Jamestown*, 96 Ohio App.3d at 685, 645 N.E.2d 1265. Furthermore, the Court notes that the Ohio Supreme Court declined to review the holding in *Jamestown* just seven months before issuing its opinion in *Grava*. While this Court does not view the denial of review as an express approval of the *Jamestown* holding, it is educational that the same court which expressly adopted the modern view of res judicata thought that an application of an exception to that doctrine was unworthy of review.

Although this Court disagrees with the Defendants' conclusions, it acknowledges Defendants' argument that there is Ohio law which supports their view that there is no declaratory judgment exception to res judicata in Ohio. Specifically, Defendants contend that the Ohio Supreme Court decided this issue in *National Amusements v. Springdale*, 53 Ohio St.3d 60, 558 N.E.2d 1178 (1990). In that case, the Ohio Supreme Court considered an appeal from a theater owner who brought an action challenging the constitutionality of a tax on cinema admissions. Because the theater owner had brought a nearly identical cause of action five years earlier (albeit prior to a United States Supreme Court opinion which may have changed the outcome of the case), the defendant argued that the second suit was barred by res judicata.

The Ohio Supreme Court began its analysis of the case by recognizing that both causes of action requested an identical declaratory judgment and that the only difference in the second cause of action was an additional clause demanding that the city remit the taxes paid since the first law suit. *Id.* at 61 n. 1, 62, 558 N.E.2d 1178 (citing n. 1). Then the Court noted the law of res judicata as explained in *Rogers* which empha-

---

**15.** Interestingly, the Supreme Court of Ohio had stated the "modern" view of the current rule as early as 1922, that is, in that year the Court acknowledged that res judicata barred the litiga-

tion of any material issue which the parties "might have litigated" in their earlier adjudication. *Schram v. City of Cincinnati*, 105 Ohio St. 324, 329, 137 N.E. 868 (1922).

sizes that a party has a duty to bring all claims which "were *or might have been* litigated in a first lawsuit." *Id.* at 62, 558 N.E.2d 1178. Because the wording of the causes of action in both lawsuits was identical and the additional claim for relief could have been brought in the initial suit, the Court found plaintiff's claim barred by res judicata. *Id.*[16]

This analysis by the *National Amusements* Court does not impact this Court's consideration of the existence of a declaratory judgment exception for two complimentary reasons. First, although the initial cause of action in *National Amusements* was one for declaratory judgment, the declaratory judgment exception was not raised by the parties in the second cause of action; it was not before the Court and the Court did not consider it. Second, even if that exception had been raised, it would not have been applied by the Court in that context. The declaratory judgment exception to res judicata does not allow a plaintiff to bring successive *identical* declaratory judgment actions as the *National Amusements* plaintiff was attempting. Rather, the declaratory judgment exception is a product of the declaratory action itself, the purpose of which is to allow parties to receive a relatively expedient opinion on one issue which could control the outcome of the case. If the declaratory device functions perfectly, the parties need not reach other, potentially meritorious causes of action arising out of the same circumstances as the first. The usefulness of the declaratory judgment itself would be eliminated if we were to allow the doctrine of res judicata to bar subsequent suits brought based on *different* legal theories. However, no purpose would be served by allowing a plaintiff to bring a second suit on the *same* legal theory. It follows that in *National Amusements,* the Court was undoubtedly correct to ignore the declaratory judgment exception because the second cause of action which that Court was considering was brought on a legal theory which was identical to, rather than different from, the first suit filed by that plaintiff. *See also Shaper v. Tracy,* 76 Ohio St.3d 241, 667

N.E.2d 368 (1996) (considering suits based on identical legal issues). The *National Amusements* decision, therefore, sheds little light on the viability of the declaratory judgment exception to the doctrine of res judicata in Ohio.

Ultimately, based on the Cuyahoga Court of Appeals decision in *Jamestown* and the Ohio Supreme Court's willingness to rely on the Restatement (Second) of Judgments, the Court concludes that Ohio does recognize the declaratory judgment exception to the rule of res judicata. In the instant case, a review of the original state court complaint, (docket #33, ex. C), reveals that the only issue of law raised was the Defendants' ability under state law to allow a referendum on a particular *administrative* ordinance passed by the Cuyahoga Falls Council. None of the federal law causes of action now advanced in the instant suit were discussed. Therefore, as long as the initial state court action was one for declaratory judgment, it should fit within the res judicata exception.

■ Having thus determined that in Ohio, "a declaratory action determines only what it actually decides and does not have a claim preclusive effect on other contentions that might have been advanced," *Ketchel v. Bainbridge Township,* 79 Ohio App.3d 174, 177, 607 N.E.2d 22 (Geauga Cy. 1992) (quoting Restatement of Law 2d, Judgments (1982)), and having determined that the Plaintiffs' original complaint dealt solely with a question of law not raised in the Plaintiffs' federal complaint, the Court must next determine whether Plaintiffs' original cause of action was declaratory in nature and thus within the exception to the rule of res judicata. Defendants argue that the original state complaint requested coercive relief which changed the nature of the cause of action to something other than a simple declaratory action.

Plaintiffs' original state cause of action was entitled a "Complaint for Temporary Restraining Order[,] Declaratory Judgment[, and] Injunctive Relief." (Docket #33, ex. C.) The Plaintiffs spelled out the facts of the

---

**16.** The Court then devoted the bulk of the opinion to the rejection of the idea that a change in the controlling Constitutional law could justify exempting a case from the effects of res judicata. *National Amusements v. Springdale,* 53 Ohio St.3d at 62–64, 558 N.E.2d 1178.

case, and then requested an opinion on whether a particular vote of the Cuyahoga Falls Council could be the subject of a referendum vote of the people. (Docket # 33, ex. C, ¶¶ I–VI.) The Plaintiffs also requested the following forms of injunctive relief: (1) an order restraining the Defendants from furthering the referendum process; (2) an order barring the Defendant Board of Elections from returning the petition to the City Defendants, (3) an order barring the City Defendants from submitting same to the Board of Elections, (4) an order barring the Board of Elections from certifying and verifying the petition, (5) an order enjoining the electors from attempting to overturn the ordinance by referendum petition; and (6) the recovery of court costs, attorney fees, and "such other relief that is lawful and equitable in the circumstance." (Docket # 33, ex. C, ¶¶ III, IV.) The Plaintiffs also requested a declaration that the "Plaintiffs are able to proceed and should not be hindered in obtaining necessary building permits in an effort to promptly commence the construction of the apartment complex." (Docket # 33, ex. C, ¶ V.)

Clearly, Plaintiffs' state law complaint requested both declaratory and injunctive relief. The question thus arises whether such injunctive relief can itself be considered declaratory relief. In Ohio, a declaratory judgment action is brought pursuant to O.R.C. § 2721.02 which provides, in part, that the declaration prayed for "may be either affirmative or negative in form and effect." But this begs the question of precisely how that declaration would actually affect the parties. Fortunately, some guidance is provided by caselaw and by Ohio Revised Code Section 2721.09, which instructs that "[w]henever necessary or proper, further relief based on a declaratory judgment or decree previously granted may be given." *See also American Life & Accident Ins. Co. of Kentucky v. Jones,* 152 Ohio St. 287, 89 N.E.2d 301 (1949) (Syllabus 3) ("Where a court has entered a declaratory judgment ... it has authority ... to grant any further necessary or proper relief.")

In *Union Oil Company of Cal. v. City of Worthington,* 62 Ohio St.2d 263, 405 N.E.2d 277 (1980), the Ohio Supreme Court explored the breadth of the relief available to a land owner who had brought a successful declaratory judgment action to strike down an unconstitutional zoning law. The defendant City in that case acknowledged that the reviewing court had the ability to declare the zoning laws unconstitutional but argued that it could then "go no further," but must leave the property "unzoned" until the city adopted new zoning legislation. *Id.* at 265, 405 N.E.2d 277. The *Union Oil* Court rejected this narrow restriction of the court's powers as "impractical and inequitable." *Id.* (quoting with approval *Ed Zaagman, Inc. v. City of Kentwood,* 406 Mich. 137, 277 N.W.2d 475 (1979)). Nonetheless, the Court recognized the danger of allowing a court to rezone the property from one classification to another without evidence of the reasonableness of the new zoning category. *Id.* at 266, 405 N.E.2d 277. Therefore, the Court set out a procedure for Ohio courts to follow in such a circumstance:

> [I]n a declaratory judgment action, upon finding existing zoning unconstitutional as applied to specific real property, the trial court should give notice to the zoning authority that, within a reasonable time certain, it may, at its option, rezone the property. Further notice should be given that, if the property is not rezoned within such period of time, the court will authorize the property owner to proceed with the proposed use if, on the basis of the evidence before it, the court determines the proposed use to be reasonable. The court may enjoin the property owner from seeking a building permit, establishing a nonconforming use or otherwise changing the status quo during the interim. If necessary, the court may conduct further proceedings, including the hearing of additional evidence, to determine whether the new zoning restrictions may constitutionally proscribe the owner's proposed use.

*Union Oil,* 62 Ohio St.2d at 267, 405 N.E.2d 277.

This Court explains the holding in *Union Oil* not because this Court intends to apply those guidelines to the facts of this case, but rather to show that Ohio law presumes that

some sort of injunctive relief may be required in order to give meaning to a declaratory judgment. In *Union Oil* that relief necessarily included enjoining enforcement of the unconstitutional zoning policy. That Court also opined that appropriate relief might include authorizing a landowner to use property in a manner deemed reasonable by the court, or enjoining the landowner himself from changing the status quo before the city has had a chance to adopt new zoning requirements. *Id.*

■ Based on its reading of *Union Oil,* the Geauga County Court of Appeals reached a conclusion which this Court shares: in Ohio, a court which enters a declaratory judgment may grant whatever relief is necessary or proper to give effect to that declaratory judgment. *Ketchel v. Bainbridge Twp.,* 79 Ohio App.3d at 178, 607 N.E.2d 22.[17] The *Ketchel* Court then reasoned that because the request for necessary injunctive relief in that plaintiff's complaint would not change the nature of the declaratory action, the declaratory cause of action would fit cleanly into the declaratory judgment exception to the doctrine of res judicata. *Id.*[18] It is now for this Court to determine whether the relief these Plaintiffs requested in their state claim was necessary and proper, that is, whether it was relief appropriate to a claim for declaratory judgment. If so, then the state claim was clearly a declaratory judgment action.

Of the requests for relief stated by Plaintiffs and summarized by the Court *supra,* the first six request injunctive relief of the type

necessary to give meaning to the Plaintiff's preferred court declaration: that the ordinance in question could not be the subject of a referendum of the people. Under Ohio law, the relief sought was typical of a declaratory judgment action and therefore, the nature of the declaratory action was not changed. This aspect of the initial state complaint supports the application of the declaratory judgment exception to the rule of res judicata.

The sixth form of relief also includes a request for attorney fees and costs. Such costs are expressly allowed by Ohio Revised Code Section 2721.11 which states, "In any proceeding under sections 2721.01 to 2721.15, inclusive, of the Revised Code, the court may make such award of costs as is equitable and just." It is thus clear that the request for fees and costs made by Plaintiffs in the initial action does not change the nature of that cause of action and does not affect the applicability of the declaratory judgment exception to the doctrine of res judicata.

Finally, the Court considers Plaintiffs' other request for a declaration that the "Plaintiffs are able to proceed and should not be hindered in obtaining necessary building permits in an effort to promptly commence the construction of [the apartment complex]." (Docket # 33, ex. C, ¶ V.) One might argue that this particular demand for relief involves something that is beyond the scope of the rest of the complaint, namely, a declaration that Plaintiffs should not be hindered in their attempts to obtain their building permits.

---

**17.** Other Ohio cases reinforce the conclusion that necessary or proper, or in other words, *appropriate* relief is typically granted upon the issuance of a declaratory judgment in Ohio. *See W.O. Brisben Co. v. City of Montgomery,* 92 Ohio App.3d 812, 822, 637 N.E.2d 347, 354 (Hamilton Cy. 1994) (applying *Union Oil* guidelines); *Chace v. Dorcy Int'l. Inc.,* 68 Ohio App.3d 99, 587 N.E.2d 442 (Cuyahoga Cy.1991) (Krupansky, C.J.) (finding money damages can be appropriate in a declaratory judgment action for indemnification); *Gannon v. Perk,* 47 Ohio App.2d 125, 352 N.E.2d 606 (Cuyahoga Cy.1975) (Syllabus 1) (Krenzler, C.J.) (holding that when declaratory judgment action also seeks ancillary injunctive relief the nature of the action has not been changed from one at law to one at equity), *aff'd in part, rev'd in part on other grounds,* 46 Ohio St.2d 301, 348 N.E.2d 342 (1976).

**18.** Defendants urge the Court to view *Ketchel* and consequently *Union Oil* narrowly so as to limit the availability of "necessary and proper" relief only to declaratory actions which question the constitutionality of an ordinance. While those cases did indeed consider constitutional issues, the same conclusions can be drawn from the broader language in other authority which this Court must consider, including *American Life & Accident Ins. Co. v. Jones,* 152 Ohio St. 287, 89 N.E.2d 301 (1949) (Syllabus 3), and Ohio Revised Code Section 2721.09. Both sources allow "necessary or proper relief" in support of a declaratory judgment and neither base this relief on whether there is a constitutional basis for the declaration.

The Court does not, however, view this request as a fatal flaw. First of all, on its face, this demand for relief involves only a request for a declaration and not a request for injunctive relief. Second, even if the demand was read as one for injunctive relief, that injunctive relief would be appropriate under the circumstances. That is, if Plaintiffs had been successful in obtaining a declaratory judgment that the referendum was illegal, the state court would have been well within its authority to preclude the defendants from interfering with the rights held by Plaintiffs in the absence of that referendum. One of those rights would be the right of the landowner to apply for and (presuming the landowner met all other prerequisites) receive building permits. Hence, the relief sought by Plaintiffs in the initial state declaratory action was appropriate to such a cause of action and did not change the nature of that action.

■ By way of summary, this Court finds that the cause of action first brought in state court by these Plaintiffs was one for declaratory judgment on an issue of state law which is not a basis for their current claims before this Court. While the Ohio law of res judicata would prevent the Plaintiffs from re-litigating that state law question, an exception to that rule allows these Plaintiffs to bring this subsequent lawsuit because it relies upon different, federal legal theories. Therefore, the instant cause of action is not barred by res judicata.

## IV. Standing of the Fair Housing Service.

■ Although not challenged by Defendants, the Magistrate Judge below appropriately considered the jurisdictional requirement of standing. This Court agrees with the Magistrate Judge that "federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (Magistrate's Report, docket # 86, at 45 (citation omitted).) Standing is a rule of practice designed to enforce the constitutional rule that United States Courts only have jurisdiction over "cases" or "controversies." *Akron Bd. of Educ. v. State*

*Bd. of Educ. of Ohio*, 490 F.2d 1285, 1289 (6th Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) (quoting *Barrows v. Jackson*, 346 U.S. 249, 257, 73 S.Ct. 1031, 1035–36, 97 L.Ed. 1586 (1953); U.S. Const. art. III, § 2 cl. 1); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). "In order to establish standing sufficient to satisfy the 'case or controversy' requirement of Article III, a plaintiff in federal court must allege 'such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on its behalf.'" *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati*, 56 F.3d 710, 715 (6th Cir.1995) (quoting *Warth v. Seldin*, 422 U.S. at 498–99, 95 S.Ct. at 2205 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962))).

The Supreme Court's most recent pronouncement on standing explained that in order to establish standing under the Constitution, a plaintiff must show three things; as an "irreducible minimum" there must be:

(1) an injury in fact,

(2) a causal relationship between the injury and the challenged conduct, and

(3) a likelihood that the injury will be redressed by a favorable decision.

*United Food and Commercial Workers v. Brown Group, Inc.*, —— U.S. ——, ——, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996) (citing *Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 2301–02, 124 L.Ed.2d 586 (1993); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982)). In addition to the requirements imposed by the Constitution, the courts have developed certain nonconstitutional prudential considerations which further guide a court's determination regarding a party's standing.

"[T]he plaintiff generally must assert his own legal rights, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. at 499 [95 S.Ct. at 2205]. In addition, even when the plaintiff has alleged redressible injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the representative branches. *Id.* at 499–500 [95 S.Ct. at 2205–206]. Finally, the Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970).

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982).

▉ In his report and recommendation, the Magistrate Judge found that the Fair Housing Contact Service lacks standing as an association to bring the instant claims. As the Magistrate explained, an organization may have standing to sue in a representative capacity only when it can show that, "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested requires participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 2528–29, 91 L.Ed.2d 228 (1986); *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati,* 56 F.3d 710, 717 (6th Cir.1995) (quoting *Hunt* ). The Magistrate believes that the Fair Housing Contact Service has not satisfied these requirements.

▉ In reaching this conclusion the Magistrate considered all of the relevant evidence in the record. First, he noted that the only direct reference to the Plaintiff Service in the complaint was in paragraph eight which alleges:

> Plaintiff Fair Housing Contact Service is a not-for-profit, fair housing organization located in Akron, Ohio. Fair Housing Contact Service has had a contract with Summit County since 1974 to provide fair housing services, landlord-tenant counseling, housing research, and technical assistance. Fair Housing Contact Service is required to provide for fair housing activities throughout the county. Part of this agreement states that as a recipient of funding, Fair Housing Contact Service will "administer all programs and activities relating to housing and community development in a manner to affirmatively further fair housing within Constitutional limitations throughout the United States." Some of its employees and members are potential tenants for the apartment complex to be built by the Developers at the Pleasant Meadow Blvd[.] property. The actions and conduct of the defendants are frustrating the fair housing purpo[ ]se of the organization, its employees and members.

(Docket # 1 at ¶ 8.) Nowhere else in the complaint is the Fair Housing Contact Service specifically mentioned.

Other references to the Plaintiff Service also found includes an October 29, 1996 affidavit of Lynn M. Clark, Executive Director Fair Housing Contact Service. (Docket # 50, Exhibit L.) In pertinent part, the affidavit states:

> FHCS has been damaged by the Defendants in case No. 5:96CV1458 because its mission has been thwarted and its resources expended to combat the discrimination in housing that FHCS believes occurred as described in the pleadings in that matter.

> FHCS employees and individual members who subscribe to our services will be harmed by the Defendants in case No. 5:96CV1458 because they are perspective [sic] eligible residents for this housing which would enable them to save monies and not be forced to expend excess funds

on obtaining safe and decent housing. Preventing the development of this housing will cause FHCS employees and members permanent and irreversible harm by denying them an [sic] choice of affordable, safe and decent housing located in the neighborhood of their preference.

(Docket # 50, Exhibit L.)

Further evidence was obtained on Tuesday, November 19, 1996, at the injunction hearing before this Court. Plaintiffs presented the testimony of two persons who identified themselves as members of Fair Housing Contact Service, Sandra Montgomery and Crystal M. Williams. (Tr. at pp. 158–69.) Ms. Montgomery testified that she had been a member of Fair Housing Contact Service for about four years. (Tr. at p. 159.) In response to the question, "[i]f you could rent a two or three bedroom apartment in Cuyahoga Falls on Pleasant Meadow Boulevard and your child could attend the Woodridge schools at a below market rent, below fair market rent value, would you apply to rent at that apartment building?", Ms. Montgomery testified, "Yes, I would." (Tr. at p. 159.) On cross-examination, Ms. Montgomery testified that she became a member of Fair Housing Contact Service by calling its office, that she did not have to pay any dues, and that she does not receive any newsletters. (Tr. at pp. 159–60.) She described her contact with Fair Housing Contact Service since becoming a member as "not a lot." (Tr. at p. 160.) Ms. Montgomery further testified that her first contact with anyone regarding the case was the previous Saturday, when she spoke with Lynn Clark and volunteered to testify. (Tr. at pp. 162–63.)

Crystal Williams also testified that she would apply to rent a two or three bedroom apartment, at below market rent, on Pleasant Meadow Boulevard in Cuyahoga Falls. (Tr. at p. 166.) Ms. Williams, a student at the University of Akron, testified that if she had a subsidized apartment, she would probably attend graduate school. (Tr. at 166–67.)

Although the Fair Housing Contact Service appears to be a rather uncomplicated organization to join and maintain membership in, this Court knows of no stringent federal requirements that members of an organization must satisfy in order to be considered an organizational member. Nevertheless, the evidence does tend to show that the members are interested in equal access to subsidized housing—a topic central to the stated purpose of the Contact Service—thus it would appear that if there were some formalistic requirement for membership, both Ms. Montgomery and Ms. Williams would qualify. The Court views these women as proper "members" for purposes of determining the Fair Housing Contact Service's standing.

As this Court explained above, there are many important requirements for standing; while most of these do not require exhaustive discussion by this Court sua sponte, the Court does feel obliged to address those requirements discussed by the Magistrate in his report and recommendation. Specifically, the Magistrate Judge questions whether the Fair Housing Contact Service or its members have been injured by the Defendants' actions. (Docket # 86, at 50.) Without an injury in fact to itself or its members, the Contact Service does not have standing.

The Magistrate Judge correctly notes that the Contact Service itself has only alleged two specific harms: a thwarting of the Contact Service's mission to provide fair housing access, and the expenditure of significant time and resources to combat what it perceives to be discriminatory housing actions in this case. While the Court has serious questions regarding whether these injuries are sufficiently concrete and particularized to convey standing on the organization itself, the Court need not address those questions as it finds that the Contact Service has presented facts sufficient to allow a finding of standing in its representative capacity.

First, no one has contested, and this Court sees no reason to conclude that either the claim asserted or the relief requested requires participation of the Contact Service's individual members in the lawsuit. *See Neighborhood Action Coalition v. City of Canton*, 882 F.2d 1012, 1017 (6th Cir.1989) (allowing association to pursue injunctive relief). Second, there can be little doubt that the interests that the Contact Service seeks to protect are germane to its purpose. Fi-

nally, there is substantial evidence that the Contact Service's members would have standing to sue in their own right. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. at 343, 97 S.Ct. at 2441 (establishing associational standing).

It is fitting, of course, for this Court to hold Plaintiffs to a burden of proof appropriate to this particular stage of litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). Currently, the Court is considering a case that is at the summary judgment stage, and thus the Plaintiff Contact Service need only " 'set forth' by affidavit or other evidence 'specific facts' [which] will be taken as true." *Id.* Granted, this can be a substantial burden because the injuries of the Plaintiff Contact Service's members arise from the government's allegedly unlawful treatment of someone else. *See id.* at 562, 112 S.Ct. at 2137. But the Plaintiff Contact Service is not precluded from establishing that the government defendant's actions cause redressible injury to befall the members of the Contact Service in addition to the sponsors of the project itself. *Id.*

In the instant case, the testimony of Ms. Montgomery and Ms. Williams, which this Court must accept as true, indicates that they are African–American mothers of young children whose income makes them eligible for subsidized housing. Both women testified that they would like to be residents in the apartment complex which the Defendants are alleged to have illegally prevented from being built. At this stage of the proceedings, the testimony of Ms. Montgomery and Ms. Williams is sufficient to establish that the Defendants' denial of the site plan and subsequent denial of building permits caused them a concrete and particularized injury. Furthermore, it cannot be questioned that should the Plaintiffs in the instant cause of action be successful, the members of the Contact Service will have their injuries redressed by the actual building of the apartment complex in which they wish to live. Fair Housing Contact Service members Montgomery and Williams could file suit in their own right if they so choose.

Because the members of the Plaintiff Fair Housing Contact Service could bring this action in their own right, and because the Plaintiff's ability to satisfy the other associational standing requirements is not in doubt, this Court concludes that the Plaintiff Fair Housing Contact Service has presented sufficient evidence at this stage to satisfy the Court's inquiry into its standing to bring the instant cause of action. Insofar as the Magistrate Judge's recommendation is contrary to this holding, it is not adopted.

## V. Judicial Immunity.

Next, the Defendants make the creative argument that they are entitled to judicial immunity for all of their actions occurring after Judge Murphy issued his opinion in the state court case. The argument is presented as follows: "An administrative officer who is carrying out a court order is cloaked with judicial immunity for claims of civil rights actions." (Docket # 32, at 13 (citing *Foster v. Walsh*, 864 F.2d 416 (6th Cir.1988)).) "[Judge Murphy] issued an order upholding the referendum provision of the City charter and denying the plaintiffs' request for injunctive relief." (*Id.*) Hence, "the City's actions have been taken in obedience to a court order, [and] the City and its officials are judicially immune from the allegations of the instant lawsuit." (*Id.*) Defendants oversimplify and misapply the doctrine of judicial immunity.

Although, generally speaking, a person may enjoy judicial immunity while carrying out a court order, the Defendants in the instant case were not carrying out such an order. Judge Murphy's decision in the original state cause of action specifically denied the Plaintiffs' request for a preliminary or permanent injunction. (Docket # 33, ex. B.) Judge Murphy did not affirmatively order the Defendants to do anything. It follows that the Defendants were not carrying out a court order when they transmitted the referendum to the Board of Elections for inclusion on the next ballot, when they refused to give effect to the site plan ordinance, or when they denied Plaintiffs their requested building permits. The only thing that can be said about the Defendants' conduct is that it did not violate the court order. Their motion for

summary judgment on this ground is frivolous. The motion is denied.

## VI. Plaintiffs' Constitutional and FHA Claims.

### A. Effectiveness of the Ordinance and Effect of the Petition.

■ In order to understand the Plaintiffs' federal claims and the Defendants' motions opposing them, it is first important to understand the procedural context in which they arose. A summary of the legislative process followed in this case is thus provided. The Cuyahoga Falls City Council approved the ordinance which embodied Plaintiffs' site plan on April 1, 1996. The Mayor did not sign the ordinance, but according to the City Charter Article 2, Section 5, if the mayor does not act upon the ordinance within ten days then the ordinance "shall take effect in the same manner as if he had signed it," what this Court will refer to as a "pocket approval." So ten days after its passage by Council, the ordinance was pocket approved by the Mayor. As of this stage there was no evidence that the City Defendants did anything to give effect to the citizen's petition. But the Court will inquire further to determine if the City Defendants' subsequent actions implicated the Plaintiffs' federal rights.

Section 4 of the ordinance in question denotes that it would go into effect immediately only if it was approved by "two thirds of the members elected or appointed to Council," (Plaintiffs' exhibit 8), however, the ordinance received only 6/11 of the vote. It was not an emergency measure and did not take effect immediately. Instead, the ordinance was to take effect "as provided by law," a phrase not explained in the Cuyahoga Falls Charter, nor in the Rules and Regulations, Ordinance Number 77–1991. So, pursuant to that ordinance, we look to the Ohio Revised Code for guidance. (*See* Ord. Nos. 77–1991, §§ 8.2, 10.4.) Ohio Revised Code Section 705.16 provides: "All ordinances or resolutions shall be in effect after thirty days from the date of their passage...." Section 1.14 of the Ohio Revised Code tells us that when counting

thirty days, the first day is excluded and the last day included. May 1, 1996, is thirty days from April 1, 1996; May 2, 1996, is the first day *after* thirty days from the date of passage. Therefore, the ordinance was to take effect the moment after 12:00 midnight on May 2, 1996. *See Frontier–Embers Supper Club, Inc. v. Board of Liquor Control,* 112 Ohio App. 325, 172 N.E.2d 717 (1960). The question remains whether these City Defendants did anything to prevent the Plaintiffs' site approval ordinance from taking effect.

The City Charter states that within 30 days after the Council passes an ordinance, citizens of the city may file a petition signed by at least ten percent of the electors requesting that such ordinance be repealed or submitted to the voters as a referendum. (Charter Art. IX, § 2.) Such a petition was filed in this case on or about April 29, 1996. If the ordinance so challenged is not repealed by the Council within thirty days, the ordinance is to be submitted to a vote of the people. The ordinance itself cannot "go into effect until approved by a majority" of the electorate. (Charter Art. IX, § 2.) An ordinary reading of this Charter provision could lead one to conclude that the effectiveness of the Ordinance is stayed when the Council recognizes the filing of a valid petition.[19] However, Plaintiffs argue that the Charter language only stays the effectiveness of ordinances which have already been reconsidered by the Council and not repealed, and which have consequently been prepared for submittal to a referendum of the people. In other words, Plaintiffs believe that the effectiveness of the law is not stayed until the ordinance has been referred to the Board of Elections, which in this case occurred on May 30, 1996.

While the Court agrees that Article IX, § 2 is not artfully drafted, the Court must also agree with Defendants that its meaning is clear enough. In a vacuum, the words "no such ordinance" have little meaning, or rather, they have so many potential meanings that they are quite unhelpful. But here, the

---

**19.** This is a common procedural construct in Ohio. *See* O.R.C. § 731.29; Ohio Constitution Art. II, § 1C, Art. XVIII, § 5.

words "no such ordinance" are followed by the words "shall *go into effect* until approved by a majority of those voting thereon...."[20] It is axiomatic that in order for an ordinance to "go into effect" it cannot already be in effect. Thus in order to give meaning to these words in Article IX, Section two of the Cuyahoga Falls Charter, the Court must conclude that the ordinance has never gone into effect. At some moment in time after the filing of the petition and before the ordinance was to take effect on May 2, the effectiveness of the ordinance was stayed.

Indeed, upon the filing of the petition, the City Engineer Gerald Dzurilla sought advice from the City Law Director concerning the effect of the petition on his authority to issue building permits for the property identified in the ordinance. (Dzurilla aff. ¶ 4.) On April 30, 1996, Engineer Dzurilla received a response indicating that building permits for the construction of the apartment complex could not be issued because the site plan ordinance "does not take effect" due to the petitions. (Dzurilla aff. ¶ 5, ex. A.) Thus, practically as well as theoretically speaking, the Plaintiffs were unable to secure the benefit of their otherwise lawfully approved site plan on the date that the site plan was to take effect, May 2, 1996.

Defendants now move for judgment on the substance of the Plaintiffs' claims arising from this chain of events. Although there are several bases for Plaintiffs' instant claims, the gist of all of those claims is that Plaintiffs have been unlawfully denied their site plan and all of its consequent benefits, including a building permit for their low-income housing project. Because the Plaintiffs believe that the City's action was arbitrary and capricious when it withheld the site and building permits, Plaintiffs allege a claim based in substantive due process as protected by the Fourteenth Amendment and Section 1983. The Plaintiffs also believe that the city refused to give effect to the site plan ordinance and thus gave effect to intentional racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amend-

ment and Sections 1981, 1982, and 1983. Putting aside for the moment the racial motivations, Plaintiffs further argue that the city gave effect to a referendum which had no rational relationship to the granting of a site plan. Finally, the Plaintiffs allege that by staying the effectiveness of the site plan, the Defendants furthered anti-family bias in violation of the Fair Housing Act.

### B. Ripeness.

The question of ripeness has not, of course, been raised by the parties as a question unto itself but rather it has arisen as an element of this Court's previous discussions of the doctrine of res judicata. (*See* docket # 94, at 11.) Because the issue has been so thoroughly briefed and because a discussion of ripeness is so instructional on the merits of Plaintiffs' federal claims, the Court will address it first.

It has been said that the ripeness doctrine "dictates that courts should decide only existing, substantial controversies, not hypothetical questions or possibilities.... Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *City Communications, Inc. v. City of Detroit,* 888 F.2d 1081, 1089 (6th Cir.1989). The determination of whether a claim is ripe rests both on Article III of the Constitution and on a court's discretionary powers. *See e.g., Buckley v. Valeo,* 424 U.S. 1, 114, 96 S.Ct. 612, 680, 46 L.Ed.2d 659 (1976) (per curiam); *Socialist Labor Party v. Gilligan,* 406 U.S. 583, 588, 92 S.Ct. 1716, 1719, 32 L.Ed.2d 317 (1972); *see also* 13A Wright, Miller, & Cooper, *Federal Practice and Procedure,* § 3532 (1984). At a minimum, ripeness requires that the effects of the administrative action challenged have been "felt in a concrete way by the challenging parties." *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57, 113 S.Ct. 2485, 2495, 125 L.Ed.2d 38 (1993) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967)); *see also Lujan v. National Wildlife Federation,* 497 U.S. 871, 891, 110 S.Ct. 3177,

---

**20.** The provision also explains that the law will not take effect until five days after certification of

that approval by the Board of Elections.

3190, 111 L.Ed.2d 695 (1990) (a controversy concerning a regulation is not ordinarily ripe for review until the regulation has been applied to the claimant's situation by some concrete action).

Previously, this Court considered Plaintiffs' contention that their claim was not ripe until the election on November 6, 1996, when the voters of Cuyahoga Falls voted down the ordinance in question. The Plaintiffs believed that this Court's analysis was controlled by the Supreme Court's opinion in *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). *See also Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). In *Williamson*, the Supreme Court considered a takings claim brought pursuant to 42 U.S.C. Section 1983, and held that the claim was not yet ripe because the initial decisionmaker in that case had not yet arrived at a definitive position on the plaintiff's zoning request and thus the plaintiff had not suffered an actual, concrete injury. *Id.* The Plaintiffs in this case argued that they were unable to bring their federal causes of action until the *voters* of Cuyahoga Falls denied them of the rights they now seek to enforce. According to Plaintiffs, only after the election on November 6, 1996, was there a definitive position taken and they suffered an actual, concrete injury. The Court, however, did not accept this interpretation. (*See* docket # 94, at 15–16.)

■ After careful consideration, the Court is not convinced that the ripeness analysis heretofore applied by the parties and referred to by this Court is altogether applicable. That is, the Court believes that the application of the strict ripeness analysis explained in *Williamson* should be reserved to cases challenging the application of zoning laws. While the instant case does involve the regulation of real property by the local municipality, it does not involve a challenge to zoning laws which unarguably would accommodate the Plaintiffs' proposed housing complex. Rather, the instant case involves a challenge to the City's refusal to grant the Plaintiffs the benefit of a site plan ordinance due to the filing of a petition. Such a challenge is properly addressed by an ordinary ripeness inquiry into whether the staying of the effectiveness of the site plan ordinance was felt in a concrete way by the Plaintiffs. All evidence in the record indicates that these Plaintiffs were prepared to build the controversial housing project upon receipt of the necessary permits, and that they were denied their ability to proceed under the site plan on May 2, 1996. Based on these facts, the Court cannot help but conclude that all of the Plaintiffs' claims were ripe on May 2, 1996.[21]

In any case, even if the Court were to apply the more formalistic analysis found in *Williamson* and its progeny, the Court would conclude that Plaintiffs' claims are ripe. Specifically, the Sixth Circuit has acknowledged in post-*Williamson* zoning challenges that claims based on the Due Process and Equal Protection Clauses rather than the takings provision, are subject to a less rigorous ripeness test. *See Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 895 (6th Cir.1991); *Bannum, Inc. v. City of Louisville, Ky.*, 958 F.2d 1354, 1362–63 (6th Cir.1992); *see also Marbrunak, Inc. v. City of Stow*, 974 F.2d 43, 46 (6th Cir.1992) (implying same ripeness inquiry applicable to Fair Housing Claims). In *Nasierowski*, the Sixth Circuit considered a due process claim challenging the process by which an amendment was made to a zoning statute. The Circuit held that because the City Council in that case had voted to pass a new zoning ordinance which, *in and of itself* inflicted immediate injury on the plaintiff, his proce-

---

**21.** If this dispute centered only on the consequent denial of building permits to Plaintiffs, the conclusion would be the same. While Defendants argue that the building permits were properly denied because the Plaintiffs had failed to erect a costly fence on one end of the property, the facts make it clear that the building of the fence by Plaintiffs would have been a futile act—

what the Sixth Circuit has referred to as "a waste of time and money." *Bannum, Inc. v. City of Louisville, Ky.*, 958 F.2d 1354, 1362 (6th Cir. 1992). The Defendants had already concluded that the building permits could not issue due to the ineffective site plan ordinance. (*See* Dzurilla aff. ¶ 5, ex. A.)

dural due process claims was ripe without requiring him to first seek relief from the city's board of zoning appeals. *Nasierowski,* 949 F.2d at 893–95. There was, therefore, no need to engage in the sort of strict ripeness analysis which the Supreme Court had considered in *Williamson.* Later, in *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1214–15 (6th Cir.1992), the Sixth Circuit extended this understanding of the law to cases involving plaintiffs' demands for substantive due process. *See also Millington Homes Investors, Ltd. v. City of Millington, Tenn.,* 60 F.3d 828 (Table), 1995 WL 394143, at *8 (6th Cir.1995) (holding no ripeness requirements for substantive due process claims in zoning cases). Applying the *Pearson* holding to the instant matter, the Court must find that the Plaintiffs' due process claim satisfies any ripeness requirements.

In two cases involving equal protection challenges to the application of local zoning laws, *Bannum, Inc. v. City of Louisville, Ky.,* 958 F.2d 1354, 1362–63 (6th Cir.1992), and *Seguin v. City of Sterling Heights,* 968 F.2d 584, 587–88 (6th Cir.1992), the Sixth Circuit acknowledged the doctrine of futility as a method for attaining ripeness despite a plaintiff's failure to fulfill the *Williamson* final decision requirement. The *Bannum* Court first articulated the *Williamson* concern that finality is required before a plaintiff may bring a constitutional challenge. But the *Bannum* Court explained the reasoning behind the requirement as follows: "We do not want to encourage litigation that is likely to be solved by further administrative action and we do not want to put barriers to litigation in front of litigants when it is obvious that the process down the administrative road would be a waste of time and money." *Bannum,* 958 F.2d at 1362. Then, focusing on the latter half of this explanation, the *Bannum* Court acknowledged that the *Williamson* finality requirement could be satisfied if further administrative action by the Plaintiff would be futile. *Bannum,* 958 F.2d at 1362–63. In order to successfully argue for the application of the futility exception, a plaintiff must have made at least one unsuccessful "meaningful application" for a zoning variance. *Id.* at 1363; *Seguin,* 968 F.2d at 589.

The claim brought by the Plaintiffs in the instant case is factually distinct from the context in *Bannum* and *Seguin,* but their reasoning is nonetheless helpful. Here, the Plaintiffs do not complain of an unfair zoning requirement and the failure of the city to grant a variance to that requirement as did the plaintiffs in *Bannum* and *Seguin.* The land bought by these Plaintiffs was already properly zoned for the type of multi-family apartment complex which the Plaintiffs propose. The Plaintiffs bought properly zoned property, met the conditions required by the City for a site plan, had that site plan approved by committee, by the Council as a whole, and by the Mayor, and only then were they denied the benefit of that site plan ordinance when the City, pursuant to its Municipal Charter, gave effect to a petition bearing the signatures of ten percent of the citizenry. Thus, the Court finds it appropriate to restate its conclusion that this is not the typical *Seguin* or *Williamson*-styled *zoning* case, rather this case involves the constitutionality of giving effect to the citizens' petition by withholding the effectiveness of the Plaintiffs' site plan ordinance. It follows that *Williamson's* strict ripeness requirements should not apply at all, but in any case, it is clear that these Plaintiffs need not have applied for a zoning variance in order to bring a ripe equal protection claim.

■ One could argue, however, that the requirement of a meaningful application for a zoning variance is analogous in this case to a requirement that the Plaintiffs must attain finality through the vote of the electorate at the referendum. Applying the futility analysis of the Circuit's equal protection zoning cases, the Court finds that the Plaintiffs' equal protection claims are ripe because any further "process down the administrative road" would have been "a waste of time and money." *Bannum,* 958 F.2d at 1362. Granted, as of May 2, 1996, the citizens of Cuyahoga Falls had not yet overwhelmingly defeated the Plaintiffs' site plan ordinance as they did in November of that year, but the proof of time supports what was then an inevitable conclusion: The Plaintiffs' site plan ordinance would never gain the support of the citizenry. Insofar as the Plaintiffs can be

seen to have failed to complete their administrative process, the undisputed evidence supports the conclusion that pursuit of that administrative process through the polls would have been futile.

■ Finally, the Defendants have argued that the Plaintiffs' claims were not ripe because they failed to build a fence as they were required to do by the terms of the site plan. This argument fails at this stage of the proceedings for at least two reasons. First, the Plaintiffs here challenge the denial of the site plan itself as well as the building permit which had the fence as a prerequisite. The Defendants' "fence" argument does not explain the denial of the site plan itself.[22] Second, there is ample evidence in the record which would indicate that building the fence would have been "a waste of time and money." *Bannum,* 958 F.2d at 1362. *See* testimony of Boone at Tr. 48, 92. Plaintiffs have presented evidence that it would have been futile to build the required fence.

In sum, no matter which approach to the doctrine of ripeness one takes, the result is the same, the Plaintiffs' claims were ripe by May 2, 1996.[23]

## C. Failure to State a Claim/Municipal Liability.

■ Defendants have raised a number of other defenses to Plaintiffs' claims, including the assertion that the Plaintiffs' constitutional claims fail to state a claim against the City of Cuyahoga Falls upon which relief can be granted. (Docket # 32, at 13–14.) Because Plaintiffs have brought suit against most of the Defendants in solely their official capacity, the City is a true Defendant in this matter, and the Defendants' argument is log-ically raised. Indeed, it is well-established law that a municipal corporation is not liable for every civil rights violation committed by one of its employees. *Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Frost v. Hawkins County Bd. of Educ.,* 851 F.2d 822, 828 (6th Cir.1988). Rather, in order for the Municipality to be held liable, the Plaintiffs must demonstrate that the unconstitutional act complained of was committed by one of Defendant's employees *pursuant to an established policy or custom of that government defendant. Id.* Under appropriate circumstances, a specific occurrence of the deprivation of a constitutional right by the City could establish such an illegal policy or custom if the deprivation was due to the decision of a municipal policymaker. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986) (plurality).[24] Furthermore, a plaintiff must demonstrate that through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Board of County Comm'rs of Bryan County, Okla. v. Brown,* —— U.S. ——, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (considering § 1983 excessive force claim).

In this case there can be no doubt that the policymakers of Cuyahoga Falls declared the site plan ordinance to be ineffective and refused to issue building permits for that reason. Moreover, it is clear that the policymakers of Cuyahoga Falls did so pursuant to provisions of their City Charter and that this city policy was the moving force which gave a staying effect to the citizens' petition and referendum. The question for the Court is thus, not whether the actions of the government actors were done pursuant to a city

---

**22.** The Defendants had already concluded that the building permits could not issue due to the ineffective site plan ordinance. (*See* Dzurilla aff. ¶ 5, ex. A.)

**23.** Even if *Pearson* had not presented this Court with direct precedent for finding Plaintiffs' substantive due process claim to be ripe, the Court would find it ripe under this futility analysis as well.

**24.** The identification of policymakers is a function of state law. *St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 924–25, 99 L.Ed.2d 107 (1988)(plurality); *Johnson v. Hardin County, Ky.,* 908 F.2d 1280, 1286–87 (6th Cir.1990) (harmonizing the *Praprotnik* opinions of Justices O'Connor and Brennan finding that a policymaker is he who, under state law, has decisionmaking authority unconstrained by the policy of a superior or of the city); *Adkins v. Board of Educ. of Magoffin County, Ky.,* 982 F.2d 952, 957–58 (6th Cir.1993). "A federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925.

policy, they assuredly were, but rather the question is whether that policy has been applied so as to authorize the deprivation of federal rights.

### D. Constitutionality of Federal Statutes and Viability of Plaintiffs' Claims.

Having now dealt with an abundance of jurisdictional and other preliminary matters, the Court finds that it can finally reach Defendants' arguments which, in turn, reach the substance of Plaintiffs' claims. As stated previously, Plaintiffs claim that they suffered harm to rights protected by the Fair Housing Act, 42 U.S.C. §§ 3601, 3604, and 3617, and provisions of the Civil Rights Act, including 42 U.S.C. §§ 1981, 1982, (Complaint ¶ 37), as well as the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983 (¶¶ 39, 44); and the Equal Protection Clause of Fourteenth Amendment and 42 U.S.C. § 1983 (¶ 41). The Court will first address the Defendants' conceptually curious argument that the provisions of statutory law upon which Plaintiffs rely are unconstitutional as Plaintiffs seek to apply them. (Docket # 32, at 16.)

Defendants' first argument under this heading appears to challenge the Plaintiffs' Constitution-based claims which allege that Defendants violated the Plaintiffs' right to due process and equal protection by giving effect to the citizens petition in refusing to grant site and building permits to the Plain-

tiff Developer. Defendants first argue that Plaintiffs' real dispute is with the citizens who brought the referendum to whom the Council deferred as required by the city charter. While Plaintiffs may indeed have a disagreement with the supporters of the referendum, Defendants' argument misses the point. The citizen's opposition would mean nothing if the City did not give it effect by denying permits to the Plaintiff Developer. It is that *City* action which the Plaintiffs challenge here. In truth, Defendants' argument is nothing more than a recycling of its argument against *Monell* municipal liability. Reframing the argument in this context does not change the Court's analysis of that issue.

### 1. Equal Protection.

 Next, the Defendants argue that it would be unconstitutional to use federal statutes to condemn wholly constitutional activity. (Docket # 32, at 17.) Transposing those two negative concepts into one positive statement, the Court understands the Defendants to say that the citizens' petition for redress of grievances and the City's consequent actions are, as a matter of law, constitutionally permissible.[25] In support of this notion, the Defendants cite a state court appellate opinion and a decision of the United States Supreme Court, *James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971).[26]

In *Valtierra*, the Court considered an equal protection challenge to a provision of

---

25. Defendants' peculiar challenge to the constitutionality of the Civil Rights and Fair Housing Acts caused Plaintiffs to launch into explanations of first, the methods of proof in a discrimination claims and second, the supremacy of federal laws. (Docket # 50, at 23–25.) While in that section of their brief, the Plaintiffs say little that this Court disagrees with, the Court believes that the Defendants' challenge is more properly interpreted as an assertion that the referendum process is constitutional as a matter of law. It is that interpretation which the Court will analyze.

26. The Court thinks it necessary to address one precedent not raised by Defendants. In an earlier opinion, *Ranjel v. City of Lansing*, 417 F.2d 321 (1969), the Sixth Circuit made the overly-broad statement that a referendum "may not be attacked on Equal Protection grounds since it is founded on neutral principles." 417 F.2d at 324. Relying on an opinion of the Supreme Court of California, *Mulkey v. Reitman*, 64 Cal.2d 529,

535, 50 Cal.Rptr. 881, 413 P.2d 825 (1966), the Sixth Circuit held that "the better practice was that ... which allowed the election to proceed and ruled on the validity of the measure after its passage." *Ranjel*, 417 F.2d at 325. The *Ranjel* Court reversed a District Court judgment enjoining a citizens' initiative.

If this Court viewed the instant case as one seeking to prevent an election, the holding here would be much the same. In that case, the Court would follow *Ranjel* and allow the citizens' referendum to take place despite the implications for Plaintiffs' equal protection rights. But in this case, the citizens' democratic rights have already been exercised; the election has been held. (*See supra*, at 12.) Here, no one has prevented the citizens' from voting, rather the Plaintiffs challenge the constitutionality of the actions of the Defendants who gave effect to the allegedly improperly motivated petition. That challenge is properly before the Court.

the California Constitution which required a referendum on any low income housing project. According to the Court, the record in *Valtierra* would not support a claim that the constitutional provision was aimed at a racial minority. *Id.* at 141, 91 S.Ct. at 1333–34. Nonetheless, the plaintiffs in that case argued that the mandatory referendum procedure was unconstitutionally discriminatory on its face because it disadvantaged persons desiring public housing more than it did other groups. *Id.* at 142, 91 S.Ct. at 1334. Noting that the procedure ensured a voice to all members of the community on a decision that could "lead to large expenditures of local governmental funds for increased public services and to lower tax revenues," *id.* at 143, 91 S.Ct. at 1334, the Court rejected the plaintiffs' argument. The Court concluded that the democratic decisionmaking which a referendum embodies would not "deny any person 'the equal protection of the laws.'" *Id.*

In the instant case, one of the constitutional grounds asserted by the Plaintiffs is that by giving effect to the petition of its citizens the City denied equal protection of the laws to lower-income families with children. (Complaint Count 3, ¶¶ 40, 41.) This is essentially the same claim that was rejected by the Supreme Court in *Valtierra*. Because the Supreme Court has definitively stated that a referendum on the building of a low-income housing project is rationally related to legitimate state interests, and because families are not entitled to a more deferential equal protection standard, the Court must grant the Defendants' motion for summary judgment on Plaintiffs' count three.

Nonetheless, while this Court shares the Supreme Court's belief that referenda can be seen as the embodiment of the democratic ideals upon which this country was based, this Court also appreciates that the framers of the Fourteenth Amendment took pains to prevent the rights of a racial minority from being thwarted by the less then compelling whims of the majority. Indeed, in another context the Supreme Court has said that a "citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas v. Forty-*

*Fourth General Assembly of Colo.*, 377 U.S. 713, 735–36, 84 S.Ct. 1459, 1473–74, 12 L.Ed.2d 632 (1964) (finding referendum on state apportionment of legislature has no constitutional significance if it does not satisfy equal protection requirements); *see also City of Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 676, 96 S.Ct. 2358, 2363, 49 L.Ed.2d 132 (1976) ("If the substantive result of the referendum is arbitrary and capricious, bearing no relation to the police power, then the fact that the voters of Eastlake wish it so would not save the restriction."); *Hunter v. Erickson*, 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed.2d 616 (1969) ("The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed.").

If the Plaintiffs can demonstrate discriminatory intent or purpose, they will demonstrate a violation of the Equal Protection Clause, no matter the traditional reference to referenda. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–68, 97 S.Ct. 555, 562–65, 50 L.Ed.2d 450 (1977). Here, the Plaintiffs have attempted to provide evidence that the City furthered racial discrimination when it gave effect to the citizens' petition and consequently denied African–Americans the opportunity to live in the proposed low-income housing project. The substance of Plaintiffs' race-based challenge will be discussed later in this opinion, but it suffices to say that Plaintiffs may state a claim alleging that they were denied the equal protection of the laws by the actions of the Defendants. Cloaking the denial of Plaintiffs' requested permits in the vestments of democracy does not immunize it from constitutional challenge.

### 2. *Due Process.*

Defendants also refute Plaintiffs' due process-based allegation that the City somehow delegated zoning power to its citizens. The Supreme Court considered a similar claim in *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976). There, a developer challenged a city charter amendment which required that any rezoning action be ratified by 55% of the voters in a referendum. In

rejecting the developer's due process challenge, the Supreme Court found that citizen referenda are reservations of power important to the democratic foundation of our system of government. *Id.* at 672–73, 96 S.Ct. at 2361–62.[27] The Court went on to explain that "[a]s a basic instrument of democratic government, the referendum process does not, in itself, violate the Due Process Clause of the Fourteenth amendment when applied to a rezoning ordinance." *Id.* at 679, 96 S.Ct. at 2364–65. The Supreme Court concluded that because the rezoning decision was properly reserved to the people, it was constitutional to permit the voters to decide whether to effectuate the plaintiff's proposed rezoning plan. *Id.*

Just as interesting as the *Eastlake* Court's holding, perhaps, is the topic which the Court expressly did not address. The Court found it significant that *Eastlake* was not a case of a zoning action "denigrating the use or depreciating the value of land; instead, it involves an effort to change a reasonable zoning restriction. No existing rights are being impaired; new use rights are being sought from the City Council." *Id.* at 679 n. 13, 96 S.Ct. at 2365 n. 13. Moreover, the majority noted that the plaintiffs could seek variances if they encountered unnecessary hardship. *Id.* The instant case is thus easily distinguished from that considered by *Eastlake.* Here the Plaintiffs are not seeking to change a reasonable zoning restriction, instead they are challenging a referendum concerning whether they themselves are allowed to enjoy the rights created by an already-existing zoning scheme. These Plaintiffs cannot seek a variance from unnecessary hardships; instead the citizens of Cuyahoga Falls sought and obtained a variance from the uniform application of the zoning laws. Thus, whatever insights can be drawn from *Eastlake,* it is clear that it is not, nor does it profess to be, on all fours with the claims advanced by these Plaintiffs. The *Eastlake* opinion simply does not contemplate the facts of this case.

Comparatively, the facts of this case are similar to the facts which the Fifth Circuit confronted in *Wheeler v. City of Pleasant Grove,* 664 F.2d 99 (1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982). The Plaintiffs in *Wheeler* were apartment developers who were issued a building permit to construct an apartment complex. *Id.* In reliance upon that permit, the plaintiffs initiated preparatory work on the project. *Id.* at 100. As news of the impending construction spread throughout Pleasant Grove, citizen opposition mounted and was ultimately reflected in a referendum which demonstrated "an overwhelming resistance to the proposed apartment complex." *Id.* Consequently, the city adopted a new ordinance which forbade the building of any apartment complexes in town, and which, therefore, prohibited the plaintiffs from building their apartment complex. *Id.* The Fifth Circuit upheld the district Court's holding that the implementation of the new ordinance was arbitrary and capricious and that it was specifically intended to prevent the plaintiffs from exercising their building permit. *Id.*

In the instant case, there is substantial evidence on the record that the Plaintiff developers met all legal requirements for their site plan. Indeed, the Planning Commission approved the request, (Complaint at ¶ 17; Tr. at p. 35), and although it was obviously politically unpopular, the City Council affirmed the site plan ordinance. (Complaint

27. The *Eastlake* Court explained that "[a] referendum cannot ... be characterized as a *delegation* of power. Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create.... In establishing legislative bodies, the people can *reserve* to themselves power to deal directly with matters which might otherwise be assigned to the legislature. *Hunter v. Erickson,* 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed.2d 616 (1969)."

"The reservation of such power is the basis of the town meeting, a tradition which continues to this day in some states as both a practical and symbolic part of our democratic processes. The referendum, similarly, is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to 'give citizens a voice on questions of public policy.' *James v. Valtierra,* 402 U.S. at 141 [91 S.Ct. at 1333–34]." *Eastlake,* 426 U.S. at 672–73, 96 S.Ct. at 2361–62 (footnotes omitted; italics added).

at ¶ 19; Tr. at p. 43). The evidence also demonstrates that the Mayor himself, although opposed to the ordinance, (*see e.g.* Tr. at p. 43; Plaintiffs' ex. G), eventually "pocket approved" it. The public opposition to the proposed apartment complex was indisputably substantial and it manifested itself in a citizens' petition which first, caused the City to deny Plaintiffs the necessary site plan approval, and second, caused a referendum which ultimately overrode the vote of Council and denied these Plaintiffs the effectiveness of the site plan. The Plaintiffs now request this Court to apply the analysis used by the Fifth Circuit in *Wheeler* to conclude that the reasons for the denial of the ordinance of "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare" of the community. *Wheeler*, 664 F.2d at 100 (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926)).[28]

Although not controlling, an opinion by Chief Judge Peter Dorsey of the District of Connecticut is helpful in understanding the propriety of Plaintiffs' request. In *TLC Development, Inc. v. Town of Branford*, 855 F.Supp. 555 (D.Conn.1994), Chief Judge Dorsey was confronted with a situation in which a builder had requested a site plan which could only be denied "if it fail[ed] to comply with requirements already set forth in the zoning ... regulations." *Id.* at 557 (quoting Conn.Gen.Stat. § 8–3(g)). The defendant town nonetheless denied approval of the plaintiff's site plan because of reasons other than those specifically articulated by law. Judge Dorsey held that "there was no basis *in the law* for the denial." *Id.* at 558 (italics

added). He explained that "[A] town, through its Commission, cannot arbitrarily refuse to permit a landowner to use land if the proposed use comports with the uses permitted in the district in which the land is located. By articulating the uses permitted in a district, a town has fixed the uses which accommodate all the considerations permitted by the law in adopting a town plan. Once it has done so, a town cannot prevent a permitted use based on factors which might have been, or were, considered in deciding the uses permitted in the zoning district." *Id.* In essence, Judge Dorsey found that it was rational for the Town to consider factors such as traffic, parking, and safety when making zoning decisions. But once that zoning decision has been made, it would be arbitrary and irrational to deny a site plan which actually conforms to that zoning decision, especially if the reasons for denial are the previously-addressed and decided traffic, parking, and safety concerns.

Similarly, the Defendants in the instant case enumerate a number of "rational" reasons for regulating the Plaintiff developer's land. But, as Judge Dorsey said in *TLC*, "That is not the question presented." *Id.* at 558. Rather, the focus of this Court's inquiry is whether there is a rational basis *in the law* for the denial. Seen in a light favorable to Plaintiffs, the evidence in this case indicates that there was no such rational basis in the law. (Testimony of Planning Director Louis F. Sharpe, Tr. at 150, 156–57.) It follows that the Plaintiff developers have stated a claim that the denial of the site plan and building permits was arbitrary and capricious in violation of the Due Process Clause of the Fourteenth Amendment.

---

28. Two years after its decision in *Euclid,* the Supreme Court applied this holding to the application of a city ordinance which provided that in order to operate a "philanthropic home for children or for old people," the trustee must first obtain written consent from "the owners of two-thirds of the property within four hundred feet of the proposed building." *State of Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 118, 49 S.Ct. 50, 51, 73 L.Ed. 210 (1928). The Supreme Court acknowledged that *Euclid* required that "in its general scope" the ordinance must be held valid, but nonetheless found that the *Roberge* delegation of zoning power to a narrow segment of society was repugnant to the

Due Process Clause. *Id.* at 122–23, 49 S.Ct. at 52. The Court found it particularly troubling that the decision of the neighboring landowners was "uncontrolled by any standard or rule prescribed by legislative action," and that the trustee was "bound by the decision or inaction of such owners.... [T]heir failure to give consent is final." *Id.* at 122, 49 S.Ct. at 52. *See also Eubank v. City of Richmond,* 226 U.S. 137, 143–44, 33 S.Ct. 76, 77, 57 L.Ed. 156 (1912) (holding that delegation of the power to determine use of property to two-thirds of neighbors is arbitrary and capricious, and unreasonable exercise of police power).

This conclusion is in conformity with Sixth Circuit due process precedent. In 1992, the Sixth Circuit explained what it terms to be the "many meanings of substantive due process." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216–17 (6th Cir.1992). First, the Circuit offered this general definition: Substantive due process is "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed...." *Id.* at 1216 (citations omitted). The Sixth Circuit then explained that chief among the rights protected by substantive due process is "[t]he right not to be subject to 'arbitrary or capricious' action by a state either by legislative or administrative action ..." *Id.* at 1216–17. The *Pearson* Court explains that when reviewing state administrative actions, federal courts can make an extremely limited review of the evidence to determine if the decisionmaker took a substantial departure from accepted norms; when reviewing legislative acts, the inquiry is further limited to whether the legislative action is rationally related to any legitimate state land use concern. The parties in the instant case have correctly treated the decisions to stay the effect of the site plan ordinance and to deny the Plaintiffs' building permits as administrative actions, thus the Court should apply the deferential administrative standard to the case at hand. In effect, the Court should determine whether there was a basis *in the law* for the Defendants' actions.

As stated above, the Court finds that there is evidence in the record to support Plaintiffs' claim that there was no basis in the law for Defendants' actions. Plaintiffs have presented evidence that indicates that their proposed site plan comports with the present zoning classification. It is thus Plaintiffs' contention that there is no rational basis *in the law* for the denial, (*see Wheeler*, 664 F.2d at 100; *TLC*, 855 F.Supp. at 558), and that by giving effect to the citizens' petition, that is, by denying Plaintiffs the benefit of the site plan ordinance, the Defendant City has engaged in the arbitrary, irrational and therefore unconstitutional application of the law.[29] Without deciding the issue, the Court simply states that Plaintiffs have presented sufficient evidence to support such a due process claim brought pursuant to Section 1983. Accordingly, the Defendants' motion for summary judgment on this count is denied.

## E. Intent to discriminate.

The only other substantive argument offered by Defendants against the Plaintiffs' Equal Protection and Fair Housing claims is that the Plaintiffs have failed to present evidence which could demonstrate that the site plan and building permits were denied for discriminatory reasons. (Docket # 32, at 14.) The Defendants offer several reasons why "reasonable minds could only conclude that the City acted with non-discriminatory reasons." (Docket # 32, at 14.) First, the Defendants note that the Planning Commis-

**29.** An earlier Sixth Circuit opinion considering *a procedural* due process claim, *Brookpark Entertainment, Inc. v. Taft*, 951 F.2d 710 (1991), *cert. denied*, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992), is analogous to the case at hand. In *Brookpark*, the Sixth Circuit struck down Ohio's former "Particular Premises Local Option" statute which allowed voters to target and ultimately divest particular establishments of their liquor licenses. After noting that the *Brookpark* plaintiffs had a property interest in their liquor licenses, *Brookpark*, 951 F.2d at 716, the Court held that the social regulation was demonstrably arbitrary or irrational, and therefore denied the Plaintiffs of property without due process of law. *Brookpark*, 951 F.2d at 716; *see also Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). The *Brookpark* Court reiterated the concern expressed by the Seventh Circuit's Judge Posner, "that the voters might 'gang up' to drive out of business a seller of liquor whom they disliked for reasons unrelated to any plausible public interest." *Brookpark*, 951 F.2d at 716 (quoting *Philly's v. Byrne*, 732 F.2d 87, 90 (1984)). According to Judge Posner, "This is a distinct type of arbitrary action that the requirement of fair procedure is designed to prevent...." *Philly's*, 732 F.2d at 90; *Brookpark*, 951 F.2d at 716. Based on this understanding of the law of procedural due process, the Sixth Circuit held that a statute which allows for the "arbitrary targeting" of a "particular premises" facially violates the Due Process Clause of the Fourteenth Amendment. *Brookpark*, 951 F.2d at 715. Here, the Plaintiffs' argument is that the citizens of Cuyahoga Falls "ganged up" to prevent them from building their low-income housing project for reasons unrelated to the consideration of a site plan ordinance.

sion, the City Council, and the Mayor all effectively approved the project, and that the Clerk of Council merely followed the plain language of the City Charter when he referred the petition to the Board of Elections for a referendum. Further, Defendants argue that City Engineer Dzurilla was only following the City Law Director's interpretation of the law when he refused to issue the Plaintiffs' building permits. Finally, the Defendants argue, the building permits could not be issued until the Plaintiffs constructed a substantial fence and associated mounding. Because the fence was never built, the building permit could not legally issue.[30] Based upon this understanding of the context, the Defendants believe that Plaintiffs cannot possibly prove the discriminatory intent essential to the FHA and Equal Protection claims.

Plaintiffs disagree. First, Plaintiffs note the oft-repeated adage that local government officials seldom state outright their discriminatory motives. (Docket # 50, at 19 (citing *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064–65 (4th Cir.1982)).) Nonetheless, Plaintiffs acknowledge that they must present some proof of racially discriminatory intent or purpose to establish an equal protection claim. *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). In the typical equal protection challenge to governmental action, a plaintiff will attempt to establish the city's intent to discriminate by offering proof of four objective factors that have been found to be probative of racially discriminatory intent:

(1) the racial impact of an official action;

(2) the historical background of the decision;

(3) the sequence of events leading up to the challenged decision, including depar-

tures from normal procedures and usual substantive norms; and

(4) the legislative or administrative history of the decision.

*United States v. City of Birmingham, Mich.*, 727 F.2d 560, 565 (6th Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (citing *Arlington Heights*, 429 U.S. at 266–67, 97 S.Ct. at 563–65) ("No single factor may be dispositive of this decision.").

In the instant case, the Plaintiffs have alleged that the government is giving effect to a petition (and thus also to the motivations) of its citizens. This Court is therefore confronted with "governmental action" that incorporates the actions and motivations of private citizens. Therein lies the dilemma, because although *Arlington Heights* teaches us to look at the context of the dispute, Sixth Circuit precedent advises against inquiring into the motivations of the electorate. *Arthur v. City of Toledo, Ohio*, 782 F.2d 565 (6th Cir.1986). An explanation may be in order.

In *Arthur v. City of Toledo, Ohio*, the Sixth Circuit considered a challenge to a referendum in which the voters repealed sewer extension ordinances which had been approved by their city council and which would have benefitted two low-income public housing projects. 782 F.2d 565. The Circuit first explained the lessons of *Hunter v. Erickson, James v. Valtierra, Arlington Heights*, and *Washington v. Seattle School District No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982),[31] in which the Supreme Court balanced the democratic ideals embodied in referenda, with the people's right to the equal protection of the laws. After dutiful consideration of these and other substantial precedents, the Sixth Circuit held that "absent a referendum that facially discriminates racially, or one where although facially neutral, the only possible rationale is racially motivated, a district court cannot

---

**30.** See the Court's rejection of this argument in the ripeness section *supra*. The Court's analysis applies equally well in this context.

**31.** In *Washington*, the Supreme Court held unconstitutional a statewide voter initiative designed to terminate the use of mandatory busing for purposes of racial integration in Washing-

ton's public schools. *Id.* While the initiative was facially neutral, the Court concluded that the initiative improperly reallocated "the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." *Id.* at 474, 102 S.Ct. at 3197.

inquire into the electorate's motivations in an equal protection clause context." *Arthur,* 782 F.2d at 574; *see also United States v. City of Birmingham, Mich.,* 727 F.2d 560, 564 (1984), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) ("We do not read the opinion of the district court as dependent upon the motivation of voters in this referendum for its decision.").

Straight application of the *Arthur* holding to the case at hand might bar the Court from inquiring into the motivations of the citizen petitioners,[32] but the Court sees a distinction between inquiring into the thoughts of the voter at the voting box, and recognizing the stated motivations of citizens at public meetings and of those who organize and effectuate a petition drive. Where the former would involve the scrutiny of "people acting in a legislative capacity," the latter is simply an attempt to "gather additional information concerning the basis of opposition to the [ordinance]." *United States v. City of Birmingham, Mich.,* 538 F.Supp. 819, 829 (1982). True to the democratic ideals enunciated in *Arthur,* the Court will not interpret the words of a few as the will of the many, but will consider the stated motivations of some citizen petitioners as one factor in the broad context in which this dispute arose.

■ That groundwork having been laid, the Court has little trouble concluding that, when viewed in a light most favorable to the Plaintiffs, there is some evidence which would support Plaintiff's race-based equal

protection claim. That is not to say that the Court finds that the evidence is of such strength that it compels an injunction in Plaintiffs' favor—that is not the question here—but the evidence is certainly sufficient to allow Plaintiffs' claim to survive summary judgment. The parties will be expected to present their views of that evidence, and its relevance to the *Arlington Heights* framework for establishing intent, at the trial.

■ Although this analysis also has serious implications for the efficacy of Plaintiffs' Fair Housing Act claims, the Court will address those claims separately. The Fair Housing Act, 42 U.S.C. § 3601, et seq., states that "it is unlawful to ... make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a); *see also* 42 U.S.C. § 3617. Familial status is defined as "one or more individuals (who have not attained the age of 18 years) being domiciled with (1) a parent or another person having legal custody of such individual or individuals...." This section has been held to apply to municipalities. *United States v. City of Parma, Ohio,* 661 F.2d 562 (6th Cir. 1981).

One part of Plaintiffs' FHA claim asserts that by staying the effectiveness of the site plan ordinance and consequently refusing to grant building permits pursuant to that ordinance, the city is giving effect to the anti-family and anti-minority biases of the citizen

---

**32.** Here, the Plaintiffs do not dispute that the site plan ordinance was facially race-neutral. Rather, the Plaintiffs argue that their right to the equal protection of the laws was violated because the City gave effect to the racially discriminatory will of its citizens. Applying the *Arthur* holding to this argument, the court would ask if racial bias is "the only possible rationale" for the citizen's petition to which the Defendants gave effect. The answer to this question would surely be no. Other possible rationales for the citizens' petition (and subsequent referendum) include, for example, concern about the effect of low-income housing on property values of surrounding properties, or worries over increased demand on public services or schools.

Indeed, as far as this Court can tell, there will always be another non-race-based rationale for a referendum, and thus a court in the Sixth Circuit will never be able to inquire into the electorate's motivations. Even the factual scenario encoun-

tered by the Supreme Court in *Washington v. Seattle School District No. 1* would not survive the Sixth Circuit's strict test: while in *Washington,* the Supreme Court found that the facially neutral initiative "was effectively drawn for racial purposes," it also acknowledged the district court's finding "that voters were moved to support [the initiative] for 'a number of reasons,' so that it is impossible to ascertain all of those reasons or to determine the relative impact of those reasons upon the electorate." *Washington,* 458 U.S. at 464, 102 S.Ct. at 3192. If the *Washington v. Seattle School District No. 1* scenario took place within the jurisdictional boundaries of the Sixth Circuit today, the district court would not be allowed to make an inquiry into the racial basis for the initiative because of the District Court's acknowledgment that the rationales of the electorate were many and varied; Washington's anti-desegregation referendum would still be good law.

petitioners, and therefore violating § 3604(a) by making dwellings unavailable to potential home builders/buyers based on their race and on whether they have children under 18 years of age.

Again, Defendants only challenge the Plaintiffs' ability to prove discriminatory intent (the first requirement to be met in a discrimination claim). Plaintiffs attempt to satisfy their burden of proof on this question in two ways. First, they argue that intent can be shown pursuant to the same *Arlington Heights* analysis used to evaluate their equal protection claim. *See also Smith & Lee Assoc. v. City of Taylor, Mich.*, 13 F.3d 920, 927–28 (6th Cir.1993). The Court has already ruled that under this analysis there is sufficient evidence to create an issue of fact concerning whether discriminatory intent played a part in the injury allegedly suffered by Plaintiffs. While that ruling concerned Plaintiffs' race-based equal protection claim, a review of the evidence reveals a similar question of fact concerning the role of anti-family bias in the denial of Plaintiffs' site plan and requests for building permits. This alone is sufficient reason to deny Defendants' motion for summary judgment on Plaintiffs' fair housing claim.

However, the Court deems it wise to explain the alternative argument of the Plaintiffs that should they not succeed in satisfying the terms of the *Arlington Heights* analysis, they can demonstrate that the Defendants' actions have a disparate impact upon African–Americans and families. (Docket # 50, at 17–18 (citing *Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir.1986); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978)).) While it is true as Plaintiffs claim that under the Fair Housing Act, "even practices which unintentionally cause a disparate impact upon a protected class can be held unlawful[,]" the Court directs Plaintiffs' attention to the *Arthur* Court's holding that "absent highly unusual circumstances, the discriminatory *effect* of a referendum cannot establish a violation of the Fair Housing Act." *Arthur*, 782 F.2d at 575 (empha-sis added). Although we cannot be certain what the Sixth Circuit meant by "highly unusual circumstances," we know that a Court should consider the following three factors:

(1) the strength of the plaintiff's showing of discriminatory effect;

(2) the defendant's interest in taking the action complained of; and

(3) whether the plaintiff seeks to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Arthur*, 782 F.2d at 575 (refusing to adopt Seventh Circuit's "discriminatory intent" factor because plaintiffs should not receive "half-credit" for failing to satisfy *Washington v. Davis* constitutional standard). Needless to say, this legal path takes Plaintiffs on an uphill climb. While Defendants unsuccessfully challenge the Plaintiffs' ability under the law to assert a disparate impact claim, they have not challenged the Plaintiffs' ability on the facts of this case to satisfy the *Arthur* criteria, thus the Court will leave for a future date consideration of the evidence under this analysis.

Similarly, Plaintiffs' claim based on the Fair Housing Act, 42 U.S.C. § 3617, survives Defendants' motion for summary judgment. Section 3617 provides that

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the Fair Housing Act].

42 U.S.C. § 3617. The Sixth Circuit has interpreted this provision as restricting those "who are in a position directly to disrupt the exercise or enjoyment of a protected right and [who] exercise their powers with a discriminatory animus." *Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir.1994). "Under this standard, the language 'interfere with' encompasses such overt acts as racially-motivated firebombings, . . . sending threatening notes,

... and less obvious, but equally illegal practices such as exclusionary zoning, ... deflating appraisals because of discriminatory animus, ... and insurance redlining...." *Id.* (citations omitted). In the instant case, Plaintiffs argue that the Defendants discriminatorily denied them of the site plan and building permits to which they were entitled due to the race and familial status of the project's future tenants. The ultimate determination of this issue depends on the same type of sensitive factual inquiry which the Court discussed above, and thus, the Court's conclusion is here the same: Plaintiffs have presented evidence which, when viewed in a light most favorable to them, could establish the claim asserted. Defendants' motion for summary judgment on this ground is also denied.

### VII. Mayor Robart, Individually.

According to the Plaintiffs, the Mayor violated their rights to Due Process and Equal Protection as protected by 42 U.S.C. Sections 1981, 1982, and 1983, and those rights protected by the Fair Housing Act. (*See* Complaint.) The actions of the Mayor which the Plaintiffs challenge include his express opposition to the Plaintiffs' proposed housing project, attendance at and alleged contributions to several meetings of citizens opposed to the project, and certification of the citizens' referendum opposing the project. (Docket # 49.) In his motion for summary judgment Mayor Robart offers at least four separate grounds which he believes entitle him to relief. The first, res judicata, has been discussed above. The second through fourth bases for the Mayor's motion include the doctrine of qualified immunity, the Mayor's assertion of an absolute privilege, and the assertion by the Mayor that Plaintiffs can offer no evidence that the Mayor in any way caused their alleged harms.

 "Qualified or 'good faith' immunity is an affirmative defense that is available to government officials performing discretionary functions." *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992). A state official is entitled to qualified immunity if his allegedly unlawful conduct was objectively reasonable when considered in light of the legal rules that were clearly established at the time the challenged conduct was taken, and of the information possessed by the official. *Id., quoting Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). A plaintiff bears the ultimate burden of showing that the defendant is not entitled to qualified immunity once the defendant has presented facts to suggest that his actions were in fact performed within the scope of his authority, *Rich,* 955 F.2d at 1095.

Thus, when faced with a motion for summary judgment based on qualified immunity, a court must consider the following two issues:

(1) whether the plaintiff has asserted a violation of [a] known civil constitutional right; and

(2) whether the constitutional rights was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights.

*Hutsell v. Sayre,* 5 F.3d 996, 1003 (6th Cir. 1993) (Suhrheinrich, J.), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994), *citing Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). If either question in the two part qualified immunity analysis is answered in the negative, summary judgment must be granted to the state actor as a matter of law.

In the present cause, the Court has already determined that Plaintiffs have asserted violations of their known federal rights pursuant to Section 1983, and the FHA. It is now left for this Court to determine whether the right was clearly established in May of 1996, that is, whether "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violates that right ...." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. This determination depends on whether there is controlling precedent in the Sixth Circuit or the Supreme Court of the United States. *Marsh v. Arn,* 937 F.2d 1056 (6th Cir.1991); *Black v. Parke,* 4 F.3d 442, 445 (6th Cir.1993).

First, the Court must determine which conduct of the Mayor is actionable. Certainly, all of the claims brought by Plaintiffs against the Mayor in his individual capacity hinge on the Plaintiffs' ability to show that the Mayor actually did something which caused them harm. A review of the evidence cited by Plaintiffs reveals that there is no proof that the Mayor contributed to the referendum process aside from lending support by answering some procedural questions. Eventually, when the view of the electorate became obvious, he amplified their opposition to the project and, indeed, encouraged the City Council to oppose it "with vigor." (Robart depo. p. 63–5.) He suggested finding a legal way to preclude building the project; he advised that denying the permit would cause expensive delay which could work to the city's advantage. However, when push came to shove, that is, when Council ignored his advise and approved the site plan in question, the Mayor declined to exercise his veto power, instead allowing the ordinance to take effect without having to express any official approval or disapproval of it whatsoever.

Mayor Robart's position on the project admittedly shifted during the proceedings leading to the referendum, but at the critical time when he could have either directly helped or hurt the Plaintiffs' cause, the Mayor avoided taking any action and, instead, allowed the Plaintiffs' site plan ordinance to take effect due to his pocket approval. The facts in evidence do *not* sustain Plaintiffs' unsupported assertions that the Mayor organized the petition drive in question, that he secured meeting places for the citizen group opposed to the project, that he certified the petition, or that he submitted the referendum question to the Board of Elections.

There does appear to be a question, however, concerning whether the Mayor caused the denial of Plaintiffs' request for a site plan or building permits. According to the May-

or, he asked the City Service Director to circulate a memo requesting that building permits not be issued to the Plaintiff developers. (Docket # 34, at 4, 8 (Robart aff. ¶ 15).) While the City Law Director had already issued a similar memorandum, the Court cannot help but conclude that there is a question of fact concerning whether the Mayor's memo was a cause of the denial of the Plaintiffs' building permits. It is this act of Mayor Robart, ordering the issuance of the memo, which the Court will analyze to determine if a reasonable official in the Mayor's position would understand that what he was doing violated the Plaintiffs' constitutional rights. *See Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

■ The Court concludes that based on existing Supreme Court and Sixth Circuit precedent, a reasonable official would not necessarily understand the ramifications of his act on the federal rights of others.[33] That is, the Court finds that although the precedent might indeed compel a conclusion that the actions of the Defendants violated the federal rights of the Plaintiffs, no opinions of the Circuit or Supreme Court address the unique factual scenario which is now before the Court: a challenge to a city's arbitrary refusal to give effect to a site plan or issue building permits due to the alleged biases of citizen petitioners. Indeed, as the discussion above demonstrates, this dispute falls squarely in the middle between caselaw affirming the rights of citizens to referenda and other caselaw upholding the rights of individuals to be free from the arbitrary and irrational whims of the majority. A reasonable official in the Mayor's position might not have known that his actions affected the constitutional rights of others as those rights have been explained by the Supreme Court and the Sixth Circuit, and indeed, under a certain reading of the caselaw the Mayor might have felt that his actions were lawful. The Court, therefore, concludes that Mayor

---

**33.** By "federal rights" the Court means to include the rights of Plaintiffs as protected by the Fair Housing Act. Just as there is no controlling precedent which directly provides the answer to the Mayor's constitutional dilemma, there is none which adequately explains the interplay between the Fair Housing Act and the right of the

people to referenda. In short, the Mayor's denial of the Plaintiffs' requested building permits was not obvious under controlling precedent, and thus the Mayor may have reasonably believed that he was behaving lawfully. He is qualifiedly immune from Plaintiffs' Fair Housing claims.

Robart is entitled to qualified immunity on Plaintiffs' claims against him in his individual capacity. Mayor Robart's motion for summary judgment is granted.

## VIII. Conclusion.

The motions before the Court are those of the Defendants for *summary judgment.* As the parties are well aware, when considering such a motion, it is imperative for the Court to consider all of the evidence in a light most favorable to the non-moving party, here the Plaintiffs. After viewing the evidence in this manner, the Court agrees with the Defendants that they are entitled to judgment as a matter of law on two questions: first, the Court grants Defendants' motion insofar as it challenges Plaintiffs' non-race-based equal protection claim; second, because Defendant Robart is entitled to qualified immunity, Plaintiffs may not proceed against him in his individual capacity; the Mayor's motion for summary judgment is granted.

As for the balance of Defendants' motion, the Court finds that Plaintiffs have provided evidence which, if viewed in their favor, could demonstrate claims founded in due process, as well as claims based upon Plaintiffs' right to the equal protection of the laws as guaranteed by the Fourteenth Amendment, Section 1983, and the Fair Housing Act. This order does not contemplate whether Plaintiffs will ultimately succeed in their claims, rather it merely states that Plaintiffs should be afforded a trial at which they could fairly pursue them.

The legal controversy now before the Court is no simpler now than it was when first confronted by the City of Cuyahoga Falls in the spring of 1996. When deciding whether to give effect to its citizens' petition, the City of Cuyahoga Falls stood at the intersection of two concepts essential to our constitutional democracy: the rights of its citizens to self-government, that is, their right to challenge by petition and referendum the decisions of their elected representatives; and the rights of the Plaintiffs to the equal and non-arbitrary application of the laws. This Court now stands at that same crossroad, and is charged with reconciling those basic principles. It is hoped that, with the help of the parties, that reconciliation may soon be achieved.

IT IS SO ORDERED.